FRANK E. RAFFENSPERGER AND MARY A. RAFFENSPERGER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69160. Filed March 31, 1960.

*Griffith Way, Esq.*, and *F. A. LeSourd, Esq.*, for the petitioners.
*Norman H. McNeil, Esq.*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioners' income tax for the calendar year 1953 in the amount of $2,572.84. Petitioners claim an overpayment of income tax for the same year in the sum of $2,265.96.

The first issue, whether a proper notice of deficiency was mailed to petitioners prior to the expiration of the statute of limitations as provided by section 6501(a), I.R.C. 1954, has been conceded by petitioners on reply brief.

The only remaining issue is whether the salary paid to petitioner Frank E. Raffensperger by the Union Club of Tokyo as its manager during 1953 was paid by an agency of the United States and, thus, not properly excludible from petitioners' gross income under section 116(a), I.R.C. 1939.

FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

Petitioners are husband and wife and are citizens of the United States who were residing in Japan during the taxable year in issue. Petitioner Frank E. Raffensperger filed an individual income tax return for the calendar year 1953 with the district director of internal revenue at Baltimore, Maryland, and petitioner Mary A. Raffensperger filed an individual separate return for the calendar year 1953 with the district director of internal revenue at Springfield, Illinois. On May 26, 1955, petitioners filed an amended joint income tax return for the calendar year 1953 with the district director of internal revenue at Baltimore, Maryland. When used herein, petitioner has reference to Frank E. Raffensperger unless otherwise indicated.

Petitioner was manager of the Union Club of Tokyo, hereafter referred to as the Club, from May 1949 until March 1956 and was a bona fide civilian resident of Japan, residing in Tokyo, for an uninterrupted period beginning in 1949 and extending beyond the calendar year 1953. Petitioner was paid a salary of $10,208.38 by the Club for the calendar year 1953. The Club withheld income tax from petitioner's wages with respect to his income for the year 1953

in the amount of $3,049.10. Petitioner Mary Raffensperger also paid income tax in the amount of $518.94 at the time of filing her separate return for the year 1953.

The Club, originally known as the American Club, came into existence in 1946 as a result of a directive issued by the Assistant Chief of Staff, United States Army Forces, Pacific, to the civilian personnel section requesting that a civilian personnel social club be established, and ordering the appointment by the section of an acting board of governors to make the necessary arrangements for the establishment of the club. Pursuant to this directive, an acting board of governors was appointed which made plans for the organization of the club and drafted a constitution and bylaws.

The proposed constitution and bylaws of the Club were examined by the theater judge advocate who advised that the proper classification of the Club was that of a nonappropriated "Sundry Fund for Civilians" under Army Regulations 210-100, subject to the supervision of the military commander, United States Army Forces, Pacific.

On November 28, 1946, the constitution of the Club was approved by the Chief of Staff, General Headquarters. The original constitution of the Club provided, in part (1) that the board of governors had full power and authority to manage and control the affairs of the Club, subject to the approval of the Deputy Chief of Staff, General Headquarters, who was recognized as ex-officio chairman of the board, (2) that all board decisions on policy matters were subject to the approval of the Deputy Chief of Staff, and (3) that the minutes of each board meeting, quarterly audits of the Club treasurer's accounts, amendments to the constitution, and regulations governing the use of the facilities of the Club would be submitted to the Deputy Chief of Staff for approval.

As a result of negotiations between the acting board of governors and officers of the general staff, a site was selected for the use of the Club in a 5-story building known as the Tokyo Kaikan located in downtown Tokyo. The building was then being occupied by the headquarters commandant of the Far East Command (FEC). On January 11, 1947, the commanding general issued a written order allocating the use of the building and its facilities between the Club and the headquarters commandant. The order also provided that certain personnel, including the manager, would be furnished by General Headquarters, FEC, and would be paid from appropriated funds as War Department employees. Overtime work performed by such employees would be paid by the Club's own funds. The headquarters commandant was directed to procure for the Club necessary furnishings, supplies, and services.

The board of governors assumed responsibility for the Club on January 15, 1947.

On June 23, 1947, a memorandum order entitled "Nonappropriated Fund Activities" was issued by General Headquarters, FEC, as a guide for the proper operation of all clubs and club funds within its jurisdiction. The Club was directed to comply with this memorandum, which provided, in part, that (1) the board of governors should assume positions of trust as liaison officers and assistants of the headquarters commandant, (2) the president of the Club was responsible for proper accounting procedure of all funds in accordance with Army regulations, (3) the Club should submit a copy of its monthly financial statement to headquarters, (4) all Club funds should be subject to audit by the group auditor at the discretion of the headquarters commandant, (5) the use of United States currency was prohibited and military script was the only currency authorized for the operation of the Club activities, and (6) upon dissolution of the Club, surplus property and all residual assets must be disposed of in accordance with Army regulations.

Although regular membership in the Club was restricted to civilian employees of the Department of Defense, associate membership was available to civilian employees of other agencies of the United States and other civilians who were authorized to use military script. Military personnel were entitled to associate membership and the total military membership was 30 per cent of the total regular membership. Private clubs having no direct connection with the Army were permitted to use the Club.

Prior to 1952 payment of petitioner's salary had been assumed by the Club, although the Club continued to receive substantial logistic support from the FEC. On July 1, 1952, petitioner entered into a written contract covering the period here involved for the management of the Club. The contract was between petitioner and the board of governors of the Club and provided for payment of petitioner's salary by the Club and specifically that the contract was not an obligation of the United States Government.

The treaty of peace between the United States and Japan was signed on September 8, 1951, and became effective on April 28, 1952. This treaty terminated the right of the United States to requisition Japanese property. Article VI of the peace treaty provided for the withdrawal of all occupational forces and the return of requisitioned property within 90 days after the effective date of the treaty, unless other arrangements should be made by the two Governments. Such arrangements were made by the United States in a security treaty (T.I.A.S. 2491) and by an administrative agreement under article III of the security treaty signed at Tokyo on February 28, 1952.

Under article II of the administrative agreement Japan agreed to grant the United States such military facilities and areas as were deemed necessary to the American Armed Forces. A joint committee of Americans and Japanese was established to decide what facilities and areas were necessary to the United States in addition to those already decided upon at the time of the agreement.

Article XV 1(a) of the administrative agreement specifically dealt with post exchanges, messes, social clubs, and other nonappropriated fund organizations of the United States Armed Forces and civilian components, as follows:

1. (a) Navy exchanges, post exchanges, messes, social clubs, theaters, newspapers and other non-appropriated fund organizations authorized and regulated by the United States military authorities may be established in the facilities and areas in use by the United States armed forces for the use of members of such forces, the civilian component, and their dependents. Except as otherwise provided in this Agreement, such organizations shall not be subject to Japanese regulations, license, fees, taxes or similar controls.

The Club was not at any time designated to be or located upon a military facility under the provisions of the administrative agreement. The Club repeatedly requested such a designation by the joint committee established under article II of the administrative agreement aforesaid. The FEC submitted a proposal to the joint committee to establish the Club as a military facility. There is, however, no evidence showing that the joint committee ever acted on this proposal.

On March 21, 1952, the Club received a directive from General Headquarters, FEC, ordering it to give up its quarters in the Tokyo Kaikan building and to find suitable facilities elsewhere, subject to approval of the FEC, or dissolve. This order was the result of a general order from the Commander-in-Chief of the FEC stating the policy of the Army with respect to off-base facilities in the post-treaty period. The following are portions of this policy statement:

1. The decision has been made that this headquarters will retain only the barest minimum off-base or off-post recreational facilities in Japan in the post-treaty period, and those retained will be for the use of enlisted personnel.
2. It is therefore directed that:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

b. All officers and Department of Defense civilian clubs or open messes operated as sundry fund activities under the provisions of paragraph 3c, AR 210–50/AFR 176–1 and Circular 1, GHQ, FEC, 1949, located off-post be released as soon as practicable but not later than 30 June 1952.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

5. There is no objection to retention or acquisition of any buildings, or other properties, at no expense to the government, as mutually arranged and agreed to by owners and the membership of activities concerned, provided financial obligations incurred do not exceed the ability of respective activities to operate on a solvent activities to operate on a solvent [sic] basis.

As a result of these orders, the Club relinquished its facilities in the summer or fall of 1952. On June 14, 1952, the FEC directed that another building, the Kasumi Kaikan building, be turned over for the use of the Club under procurement demand and that the board of governors enter into a lease with the Japanese owners of this building.

Negotiations for the lease were entered into by petitioner, representatives of the FEC, and the Japanese owners. A lease was prepared which was reviewed and revised by the office of the judge advocate. The lease between the Japanese owners and the Club was executed on September 6, 1952, and was approved by the FEC. It provided in part:

5. That the * * * [Club] shall use the property involved herein only as a civilian open mess for the civilian component of the United States Forces in Japan, excluding from membership all persons not approved by the Far East Command as a part of the United States Forces in Japan, and shall be operated under the direct control of the Deputy Chief of Staff, Far East Command: * * *

*     *     *     *     *     *     *

22. This agreement shall be subject to the written approval of the Deputy Chief of Staff, Far East Command, or his duly authorized representative, and shall not become binding or effective until so approved.

A certificate prepared for the signature of the attending witness to the lease describes the Club as: "The Union Club of Tokyo, a nonappropriated fund activity."

When the Club moved into its new quarters in the Kasumi Kaikan following the effective date of the treaty of peace with Japan, the Army's assistance to the Club was materially reduced. The Club was responsible for paying the rental on its lease. A request that the Army assume this obligation was denied. The materials, supplies, furniture, and equipment were the property of the Club. The employees were paid by the Club, whereas formerly the Army had provided 10 persons to work for the Club who were paid out of the Army's appropriated funds. However, the Army did provide night fireguards and security guards, and workmen to make occasional repairs. The Army also furnished utilities such as gas, coal, and fuel oil for heating, water, sewage, and electricity. On occasion, aid which was authorized by the Army was not provided by those responsible to perform the work because the Club had not been officially declared a military facility by the joint committee and because the Club was a private rental. Prior to the release of the facilities of the Tokyo Kaikan, the FEC furnished supplies to the Club by procurement demand on the Japanese.

The board of governors in January or February 1953 sought to move the Club onto a military installation but was refused the opportunity of doing so.

On January 17, 1953, the Club adopted a new constitution which was approved by the Deputy Chief of Staff for the FEC. Provisions of the constitution which are here pertinent are as follows:

## ARTICLE I

SECTION 1.

The name of this Club shall be The Union Club of Tokyo, a civilian open mess organized as a civilian open mess under AR 210–50 and AR 210–60 and shall be under the jurisdiction of the Chief of Staff, Headquarters, Far East Command, or such of his deputies as he may designate. * * *

SECTION 2.

The Union Club of Tokyo is organized for the purpose of providing social, educational, recreational, and messing facilities for its members.

## ARTICLE II

### MEMBERSHIP

*     *     *     *     *     *     *

SECTION 2. REGULAR MEMBERSHIP

a. Regular membership shall be extended to all United States citizen civilian employees of the Department of Defense whose duties are with the United States Forces, Japan, within the Far East Command.

b. Regular membership shall be extended to all United States citizen civilian employees who are paid from nonappropriated funds as defined in AR 210–50 and, where pertinent, AR 210–60.

*     *     *     *     *     *     *

SECTION 3. ASSOCIATE MEMBERSHIP

a. Associate membership shall be extended to all United States citizen civilian employees of the other federal agencies of the United States Government and their attached agencies and, further, all United States citizen civilians who have been authorized the use of Military Payment Certificates by the Commander-in-Chief, Far East Command.

b. The Board of Governors of the Club may at its discretion, by amendment of the By-Laws of the Club, grant associate membership to Military personnel within the Far East Command, not to exceed 40% of the regular membership.

*     *     *     *     *     *     *

## ARTICLE III

### BOARD OF GOVERNORS

*     *     *     *     *     *     *

SECTION 3. DUTIES AND AUTHORITY

a. Conduct of Meetings

The Board of Governors shall have full power and authority to manage and control the affairs and operations of the Club in accordance with pertinent Army regulations and subject to such regulations as may be promulgated by the Chief of Staff, Headquarters, Far East Command. * * *

b. Minutes of Meetings

* * * The confirmed minutes of each meeting of the Board of Governors will be presented to the Chief of Staff, Headquarters, Far East Command * * *

*     *     *     *     *     *     *

e. Policy Decisions

All decisions of the Board of Governors on the matter of policy should be in accordance with the policy established by the Chief of Staff, Headquarters, Far East Command, and shall be subject to his approval.

f. Management of the Club

* * * The Manager and all other members of his staff shall receive such remuneration as may be fixed by the Board of Governors, with the approval of the Chief of Staff, Headquarters, Far East Command. The Board of Governors shall confirm the amount of fidelity bonds required by the Treasurer, members, or other employees responsible for the control of the funds of the Club, in accordance with AR 210–50 and AR 210–60.

SECTION 4. EX-OFFICIO AND HONORARY CHAIRMAN

The Chief of Staff, Headquarters, Far East Command, or his duly appointed deputy, shall be ex-officio Chairman of the Board of Governors. * * *

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

ARTICLE VIII

FEES AND FUNDS

* * * Upon dissolution of the Club and settlement of all obligations and liabilities, the residual net worth, upon an audit certified in accordance with Army Regulations, shall be transferred in accordance with paragraphs 31, 32, 33, 34 and 35 of AR 210–60, as supplemented by directives of Headquarters, Far East Command.

On October 22, 1953, the command responsibility over the Club was assigned to the commanding officer, Camp Tokyo, by Headquarters, FEC. The letter designating the commanding officer, Camp Tokyo, as responsible for the Club provided, in part, as follows:

2. It is desired that Commanding Officer, Camp Tokyo, assume responsibility as Installation Commander for the Tokyo Officers' Open Mess, the Union Club of Tokyo, and the Joint Services Senior Officers Club, in accordance with provisions of AR 210–60. Constitutions of these clubs will be revised to require forwarding of minutes of meetings, financial statements, etc., to Commanding Officer, Camp Tokyo for approval.

3. Since these three clubs are frequently used for official and semi-official functions of direct interest to the Commander in Chief or members of his immediate staff, informal liaison between club officials and this headquarters on important or urgent matters concerning club operations is authorized.

Criminal investigations on the premises of the Club were conducted by the Japanese police. In accordance with the administrative agreement between the United States and Japan, art. IX, par. 4, T.I.A.S. 2492, the rights of Japanese employees of the Club were governed by the Japanese legislature, and the Japanese Government enforced its labor laws with respect thereto. Certain Japanese employees who had been discharged brought suit growing out of their discharge against the Club's successor organization. The Club asserted a claim of immunity from jurisdiction, and after a trial, the outcome of which is not in evidence, the employees' claims were settled by the FEC through the Japanese mediation board.

On August 14, 1954, Headquarters, Camp Tokyo, advised the Club by letter that authority had been granted by Headquarters, United States Army Forces, FEC, to consolidate the Osaka Club with the

Club. The commanding officer of Camp Tokyo further ordered revisions of the Club's constitution and bylaws to enlarge the membership of the Club's board of governors and provide for representation of members billeted in the Osaka facilities.

The Club became a branch of the Tokyo Civilian Open Mess in 1955, and its constitution was amended to reflect the change of its name on August 26, 1955. The inactivation (dissolution) of the Club, distribution of its assets, and termination of the lease at the Kasumi Kaikan premises were ordered, effective at the close of business on April 30, 1957, by the commanding general, 1st Cavalry Division, who had assumed jurisdiction over the United States military forces in Tokyo. The movable property in possession of the Club was ordered to be distributed to branches of the Tokyo Civilian Open Mess.

### OPINION.

The only remaining issue in this case is whether petitioner is entitled to exclude the salary paid him by the Club from his taxable income for the year 1953 under section 116(a)(1), I.R.C. 1939.[1] That section provides for exclusion from gross income and exemption from taxation, in the case of a citizen of the United States who was a bona fide resident of a foreign country for an uninterrupted period which includes the entire taxable year, of amounts constituting earned income "from sources without the United States (except amounts paid by the United States or any agency thereof)." It is agreed that petitioner's salary qualifies for the exclusion unless the Club, which paid the salary, was an agency of the United States in 1953. This depends on whether the Club was a "nonappropriated fund activity" of the Army under Department of the Army Regulations 210-50 and 210-100. The Supreme Court of the United States held in *Standard Oil Co.* v. *Johnson*, 316 U.S. 481, that Army regulations have the force and effect of law and that a nonappropriated fund activity is a Government instrumentality or agency. Accordingly, we must determine whether under the above Army regulations the Club was a nonappropriated fund activity of the

---

[1] SEC. 116. EXCLUSIONS FROM GROSS INCOME.

In addition to the items specified in section 22(b), the following items shall not be included in gross income and shall be exempt from taxation under this chapter:

(a) EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.—

(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States, who establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income (as defined in paragraph (3)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this paragraph.

Army, as contended by respondent, or a private association, as contended by petitioner.

A study of those regulations, copies of which were introduced in evidence, when compared with the type of organization and modus operandi of this Club, leads us to the conclusion that the Club was organized and operated as a nonappropriated sundry fund activity under the regulations and continued to be such at least through the year 1953. It would serve no useful purpose to discuss in detail all the provisions of the regulations. We will point out some of the more important provisions with respect to nonappropriated fund activities.

AR 210–100 appears to be the general authority for the establishment of civilian nonappropriated funds within the Army [2] and sets forth the general principles and policies under which they are organized and operate. AR 210–50 sets up the plan for establishing and controlling civilian and other nonappropriated funds in the field. A nonappropriated fund is defined in AR 210–50 as an entity established by authority of the Secretary of the Army for the purpose of administering moneys not appropriated by Congress for the benefit of military and civilian personnel of the Army.

Both AR 210–100 and AR 210–50 recognize generally that the providing of certain facilities and services contributing to the comfort, pleasure, mental, and physical improvement of military personnel and civilian personnel serving with the Army is the responsibility of the Army; that certain activities which are not provided for in congressional appropriations are necessary adjuncts of the Army and are authorized and designated as Government instrumentalities; that the moneys which support such activities are termed nonappropriated funds, and that such activities and funds complement benefits supplied by appropriated funds; that the Army is responsible for the administration and policies of such funds and activities; and that such funds and activities will be self-sustaining except for provision of available Government-owned buildings, essential basic equipment, and necessary command supervision. Among the characteristics peculiar to activities supported by nonappropriated funds are said to be (1) they are established under regulations of the Department of the Army, (2) military and civilian personnel of the Army are assigned responsibility for such funds and the management of their affairs, (3) individuals have no proprietary interest in these funds and profits generated by such funds do not accrue to any individual, and (4) accumulations of nonappropriated money in excess of the needs of the fund may be redistributed to other such funds.

[2] These regulations also apply to the Air Force, but we will refer only to the Army herein.

One type of civilian nonappropriated fund authorized under AR 210-100 is a civilian sundry fund whereby groups of employees may voluntarily organize to provide for themselves, on a cooperative basis, certain approved facilities, services, and activities, such as recreational and leisure-time activities. The primary source of funds for the establishment and operation of such a fund is dues and assessments from members and incidental revenues produced by its own self-supporting activities. Such a fund, organized for the purposes outlined, is deemed to be a Government instrumentality, entitled to all the immunities and privileges of such instrumentalities, and must be operated to conform to the general characteristics of sundry funds set forth in AR 210-50 and is subject to supervision and control of the Army under these regulations. Additional characteristics which must be possessed by sundry funds are specified in AR 210-50, being (1) they are established by military authority describing the purpose and designating the governing bodies, (2) individuals derive benefits therefrom exclusively through participation in the activities of the fund, (3) they do not declare dividends and do not receive financial assistance from revenue-producing or welfare funds, (4) profits generated by their activities are retained to finance the activities of the fund, and (5) the disposition of residual assets of dissolved sundry funds is prescribed by the Army.

Both regulations also recognize that other voluntary associations of individuals may be formed for social, fraternal, and other cooperative objectives, but not established to provide essential morale and recreational facilities and services for personnel of an installation. These are private associations and are not Government instrumentalities; nor are they subject to the provisions of these or other regulations governing nonappropriated funds. Apparently the only reason for mentioning such associations in the regulations is to permit them to be organized and operated on an Army installation with the permission of the installation commander. There is no clear-cut distinction between the social and recreational activities for which such an association may be organized and the social and recreational activities for which a nonappropriated fund might be organized. However, it is clear that such a private association is not entitled to any support from the Army, unless it be housing on an Army installation, is not subject to Army regulations, its assets and liabilities are its own, and upon dissolution no nonappropriated fund would have any claim to its assets.

It is clear that this Club was organized and operated, at least until the middle of the year 1952, as a nonappropriated sundry fund under the above regulations. It was organized in 1946 at the direction of, and its constitution and bylaws were approved by, the office of the Chief of Staff, United States Army Forces, Pacific. The

constitution throughout required approval of the Deputy Chief of Staff for most of its actions. The Army provided it with a building for its clubrooms, provided utilities and maintenance, and certain personnel to work in the Club. In June 1947, General Headquarters, FEC, issued a memorandum entitled "Non-appropriated Fund Activities" as a guide for the proper operation of all clubs and club funds within its jurisdiction, and the Club was directed to comply therewith. Indeed petitioner does not seriously contend that the Club was not a nonappropriated fund up to the middle of the year 1952. He contends that after the peace treaty with Japan became effective in 1952, the status of the Club changed to that of a private association.

In support of his argument that prior to 1953 the Club had ceased to be a bona fide nonappropriated fund activity and hence had ceased to be a Government instrumentality, petitioner emphasizes three events. First was the directive issued by the FEC in 1952 to the Club and other nonappropriated funds which were located off military bases ordering them to release their facilities. He contends that under the regulations nonappropriated funds are intended to provide essential morale and recreational facilities as determined by the command, and that this was a command determination that the Club and other off-base social and recreational facilities were no longer essential to the Army, and this was an order either to dissolve or operate as a private club. We agree with respondent that the language of the directive better supports a conclusion that the real estate occupied by the Club, rather than the Club itself, was no longer deemed essential. And we have already pointed out that the Army took an active part in securing new premises for the Club and the lease required approval of the Army, which would not have been required for a private association operating off base. More in harmony with the evidence is respondent's theory that the directive did not signify a change in the Club's status but did signify that Army assistance to the Club would be sharply reduced.

Second, petitioner maintains that the failure of the joint committee, established under the security treaty and the administrative agreement setting forth the conditions under which American forces would remain in Japan, to declare the Club to be a military facility necessarily precludes the Club from being a nonappropriated fund activity. True, the joint committee did not act favorably on the application but neither did it act unfavorably—it just did not act. But the evidence indicates that the Army itself considered the Club to be a nonappropriated fund and requested its designation as a military facility. The Club was informed in August 1952 that it was the policy of command headquarters to furnish all pos-

sible logistical support to the Club within the limitations of applicable regulations and availability of necessary funds. It must be remembered that the determination of whether the Club was a nonappropriated fund must be made under the Army regulations. What the administrative agreement sought to do was to work out rules for avoidance of conflicts likely to arise between two sovereigns when one had military forces established on a more or less permanent basis on the territory of the other. The fact that the joint committee failed to clarify officially the Club's status, while it may have caused inconvenience and some curtailment of support for the Club, is not determinative of the Club's status under the regulations.

Third, petitioner points to the change in the amount of assistance given the Club by the Army prior to the peace treaty as compared with the meager assistance given thereafter as evidence of a change of status. It is true that following the signing of the peace treaty the FEC issued a policy statement that during the post-treaty period it would retain only the barest minimum off-base recreational facilities in Japan, and those retained would be for the use of enlisted personnel. The Club was ordered to give up its quarters in the building provided by the Army and was directed to find suitable facilities elsewhere or dissolve. The Club had to pay the rental on its new quarters, the Army no longer provided operating personnel, and the Club apparently had difficulty getting the Army to provide the services it thought it was entitled to as a nonappropriated fund. However, the failure of the Army to provide these services and facilities does not necessarily change the status of the Club. Provision of such facilities was pretty much a matter of discretion with the commanding officer. As pointed out by respondent, when under the terms of the peace treaty the Army could no longer requisition such services and facilities but had to pay for them out of its appropriated funds, it is not strange that it became more parsimonious with its support. The mere fact that an activity, appropriated or nonappropriated, does not receive all the support it considers itself entitled to, does not change its status. Furthermore, the evidence is that the Army continued to supply utilities and guards for the Club and gave it more support than would have been authorized for a private club. A private club operating off base would not have been entitled to any support by the Army.

The evidence is that both the Army and the Club continued to consider the Club to be a nonappropriated sundry fund within the meaning of the regulations, and it operated under the supervision and control of the Army. We think this must be determinative of its status. If it was a private association, not located on an Army installation, the Army would have had no control over or responsibility for it. Yet the evidence is that the constitution and bylaws

of the Club, despite amendments enacted pursuant to directives o⅃ the Army, continued to refer to the Club as a civilian open mess under AR 210–50 subject to the jurisdiction of the Chief of Staff, FEC, and operated in accordance with pertinent Army regulations, and provided that upon dissolution of the Club, its residual net worth should be transferred to nonappropriated funds in accordance with Army regulations. The lease of the new quarters provided that the Club should use the property only as a civilian open mess for the civilian component of the United States forces in Japan under the direct control of the Deputy Chief of Staff. The Army continued to supply utilities and some logistic support. In 1954, the Army directed the Club to consolidate with another club and amend its constitution accordingly, which was done. In 1955, the Club became a branch of the Tokyo Civilian Open Mess and, pursuant to orders of the commanding officer of the United States military forces in Tokyo, it was inactivated in 1957 and its assets were distributed to branches of the Tokyo Civilian Open Mess. The Club was clearly under the supervision and control of the Army, subject to its regulations, and as such it was a nonappropriated sundry fund and an instrumentality or agency of the United States throughout the year 1953.

The cases on section 116(a) are few, and being fact cases with substantially different facts than are present here, are not particularly helpful. See *Robert W. Teskey*, 30 T.C. 456; *Leif J. Sverdrup*, 14 T.C. 859; *Krichbaum* v. *United States*, 138 F. Supp. 515 (E.D. Tenn.). For what it may be worth here, the legislative history of this provision of the law is discussed at length in the *Krichbaum* opinion. This indicates that the exclusion was originally provided to avoid double taxation of the income earned abroad by United States citizens, that is, taxation by both the foreign Government and the United States; that the exclusion was taken advantage of to permit avoidance of tax altogether on income earned by citizens outside the United States as employees of the United States; and that the parenthetical exception clause was inserted in the exclusion provision to avoid this abuse. There is nothing in this record to indicate whether employees of United States Government instrumentalities in Japan paid a tax on their incomes to Japan after the peace treaty, and nothing to indicate that petitioner's salary was so taxed, but we do not believe it could make any difference in the result here, because the plain language of the statute denies the exclusion to "amounts paid by the United States or any agency thereof."

We hold that the salary received by petitioner as manager of the Club during the year 1953 was paid to him by an agency of the United States and is not excludible from his gross income and is not exempt from tax.

*Decision will be entered for the respondent.*