BOLESLAW D. KALINSKI AND DOROTHY M. KALINSKI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CAROL MARIE SCHMIDT, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6648–73, 6649–73.    Filed April 28, 1975.

*Alexander J. Kalinski,* for the petitioners.
*Jack Raymond Selzer,* for the respondent.

DRENNEN, *Judge:* In these two cases, consolidated for trial, respondent determined deficiencies in petitioners' Federal income taxes for the year 1969 as follows:

| Petitioner | Amount |
| --- | --- |
| Boleslaw D. Kalinski and Dorothy M. Kalinski | $1,893.31 |
| Carol Marie Schmidt | 1,629.01 |

The only issue is whether petitioners properly excluded from gross income under section 911(a)(2), I.R.C. 1954, amounts earned by Dorothy M. Kalinski and Carol Marie Schmidt while employed at the United States Air Force Europe Child Guidance Center in Wiesbaden, Germany.

## FINDINGS OF FACT

The stipulated facts are so found.

Petitioners Boleslaw D. Kalinski and Dorothy M. Kalinski filed a joint Federal income tax return for 1969 with the Office of International Operations, Washington, D.C. Petitioner Carol Marie Schmidt filed a 1969 Federal income tax return as a single individual with the Office of International Operations, Washington, D.C. When the petitioners Kalinski filed their petition herein, they resided in Manchester, N.H. When petitioner Schmidt filed her petition, she resided in New Orleans, La.

In 1969 Dorothy M. Kalinski earned $5,890.59 as a secretary-stenographer, and Carol Marie Schmidt earned $8,892.98 as a speech pathologist, at the United States Air Force Europe (USAFE) Child Guidance Center (Center),[1] Wiesbaden, Germany. Petitioners Dorothy M. Kalinski and Carol Marie Schmidt were physically present in the Federal Republic of Germany, a foreign country, for at least 510 full days in 18 consecutive months, which included the year 1969. Petitioners excluded from their gross incomes the amounts earned at the Center in 1969. Petitioners Kalinski paid no income tax to the Federal Republic of Germany on Dorothy M. Kalinski's wages at the Center. The record does not indicate whether Carol Marie Schmidt paid such tax.

Establishment of the Center was authorized in the latter part of 1963 by General G. P. Disosway, USAF commander-in-chief, on recommendation of his surgeon. In so doing, Disosway cited a lack of adequate medical facilities for treatment of handicapped children of USAFE personnel in Europe, and stated that many times affected Air Force families in his command expected reassignment to areas in which treatment was more readily accessible.

The Center opened in February 1964, located in the hospital of the United States Air Force base at Wiesbaden, Germany. The Center was placed under the direction of a military child psychiatrist himself under the supervision of the commander of the USAF hospital at Wiesbaden. The Center used office space and various other facilities of the hospital. The work of the Center

---

[1] This entity was also known as the USAFE Child Guidance Clinic, USAFE Psychological Evaluation Center, and USAFE Psychological Evaluation Clinic. To avoid confusion, this entity will be referred to in this opinion as the Center.

was done by nonmilitary, civilian personnel including, at various times, a clinical psychologist, an assistant psychologist, a social worker, a speech pathologist, a secretary, and a clerk-stenographer. For professional and administrative supervision only, the civilian personnel were attached to the Wiesbaden Air Force hospital. The Center was not a base-level function; rather it was a command-wide function. By 1969 it was serving the 80,000 children of United States Air Force personnel in Europe.

The Directorate of Personal Services, Personnel Affairs Division, USAF, designed the salaries and benefits of the clinic's civilian employees to correspond with the salaries and benefits provided for nonappropriated-fund employees. Salaries of the employees were comparable to civil service grade salary levels. The employees of the Center also received other benefits similar to those received by nonappropriated-fund activity employees, including insurance in the USAF Nonappropriated Fund Group Insurance Plan.

The contracts for employment at the Center executed by petitioners Dorothy M. Kalinski and Carol Marie Schmidt were with "The USAFE Child Guidance Clinic, represented by the Custodian, Central Base Fund," as the employer, and were signed by an Air Force sergeant in custody of the Central Base Fund as "Employer." The contracts executed by the two petitioners were headed "Air Force Aid Society Employment Contract USAFE Child Guidance Clinic" and contained the following provisions:

### ARTICLE II. SCOPE OF SERVICES

c. The USAFE Child Guidance Clinic [Center] is a non-appropriated fund activity. Appropriated funds will not be used for the compensation of Child Guidance Clinic Employees. *

### ARTICLE III. OVERTIME AND HOLIDAY PAY

b. *Holiday Work.* All hours worked by the Employee at the specific request of the Employer that fall within Employee's regularly scheduled work week, will be compensated at double basic hourly pay. * * * An official US holiday is defined as that day observed by the USAF and its US citizen civilian employees paid from appropriated funds.
   * * *

### ARTICLE VIII. STATUS AND CONDUCT

a. By virtue of execution of this contract and any extensions thereto, and effective concurrently with its execution, the Employee shall be subject to military law, including but not limited to applicable rules, regulations, and directives issued by competent US military authorities, to the same extent and

in the same sense as such issuances are applicable to any US citizen employees paid from appropriated funds by the Air Force.

b. The Employee shall be expected, and does agree, to perform the duties specified in Article II of this contract diligently and effectively at all times. Further, the Employee shall be expected, and does agree, to conduct himself/herself, at all times (both on and off the job) in such a manner as to preclude any adverse reflection upon himself/herself, the Employer, and the USAF. In this respect the Employee shall be governed by the same standards of conduct and rules of discipline as are applicable to US citizen employees paid from appropriated funds. The Employer reserves the right to administer such displinary [sic] measures (i.e. reprimand, suspension form [sic] duty and pay and/or termination of this contract) as may be required for a particular offense on the part of the Employee.

### ARTICLE IX. DISPUTES AND GRIEVANCES

a. Any disputes and/or grievances on the part of the Employee which cannot be satisfactorily settled by mutual agreement between the Parties to this contract and from which an appeal is taken by the Employee shall be decided by the Commander of the installation at which the Employee is employed.

b. Initially, the dispute and/or grievance shall be presented verbally by the Employee to the Employer as represented in this instance by the Director, USAFE Child Guidance Clinic. In the event the Director's decision in the matter is not satisfactory to the Employee, he shall reduce such a dispute or grievance to writing within 5 work-days of the incident which generated the dispute or grievance stating specifically and in detail the action which is being appealed, making reference to applicable portions of this contract, when appropriate, and stating specifically the remedy sought by him/her. Such appeal shall be addressed to the Installation Commander, through the Hospital Commander. The decision of the Installation Commander is final.

Appropriated funds are those appropriated by Congress. Nonappropriated funds, in the context of this case, are moneys not appropriated by Congress but generated by participation of Air Force personnel and others for whom Air Force installations have support responsibilities in Air Force religious, morale, welfare, and recreation programs such as base exchanges, theaters, book departments, and restaurants. Nonappropriated funds are considered United States assets controlled by the Air Force. Nonappropriated fund instrumentalities, in present context, are entities established by the Secretary of the Air Force to administer nonappropriated funds for the benefit of Air Force personnel and their dependents, and civilian employees of the Air Force.

Funds for operating the Center had several sources. Appropriated funds paid for the salary of the Air Force child psychiatrist, under whose direction the Center was operated, and

for office space, supplies, utilities, and equipment. Grants from the Air Force Aid Society (AFAS) initially paid for the salaries and other benefits of the civilian employees.[2] On March 1, 1968, the Center began charging fees for its services, and thereafter, the majority of the funds to pay the Center's civilian employees' salaries and benefits came from parents of children served by the Center and the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). Starting in January 1972, appropriated funds paid all the Center's expenses.

The custodian of the Central Base Fund administered the funds of the Center; he was its contracting and disbursing officer. The Central Base Fund was a nonappropriated fund instrumentality of the United States. Funds from AFAS and from parental fees were received by the custodian and placed in an imprest fund for the benefit of the Center. Checks were drawn on this fund to pay the expenses of the Center, including the salaries of the Center's employees.

AFAS is a corporation formed under the laws of the District of Columbia. Its governing body is a board of trustees, 6 of whose 15 members are ex officio, as follows: The Secretary of the Air Force, the Air Force Chief of Staff and his wife, the Air Force Deputy Chief of Staff, Personnel, the Comptroller of the Air Force, and the Director of the Air Force Aid Society. The remaining trustees are elected, although the record does not reflect by whom. In 1964 and 1969, the only times shown in the record on this point, the AFAS director was a retired Air Force general. Since March 1, 1946, AFAS has been the official emergency relief organization of the Air Force. AFAS income is derived from annual campaign contributions, memorial contributions, profits from Air Force installation fund-raising activities, contributions from civilian firms and individuals, interest and dividends from investments, and royalties from

---

[2] In a letter to the Air Force Deputy Chief of Staff, Personnel, announcing his authorization to establish the Center, General Disosway stated:

"I request that you pass my request on to the Aid Society for a commitment for $160,800 to pay the salaries of the six persons we believe we need for the next three years to do this job. I am inclosing a more detailed plan and explanation of our proposal.

During the last three years the personnel of USAFE have contributed over $200,000 to the Air Force Aid Society. I am convinced they will give substantially more during the next three years if I can tell them of Aid Society support of our Center. Allocation of some of this money back to us, as I have requested, will allow our people in Europe to know that the Aid Society is insuring that all of our children regardless of location receive proper care and treatment."

books, songs, etc. The annual campaign is conducted by the Air Force itself to publicize AFAS benefits and to elicit contributions to AFAS from Air Force personnel. Administration of AFAS programs, and the annual campaign, at Air Force installations is performed by Air Force officers and enlisted men assigned the duty by the installation commanders.

In 1969 and through to the present so far as the record herein shows, CHAMPUS was and has been a health-care program organized under title 10, chapter 55, U.S.C., which, inter alia, makes payments for medical treatment extended by civilian personnel to certain active duty and retired members of the United States Uniformed Services and their eligible dependents. CHAMPUS' funds were appropriated by Congress. Beginning in January 1967, CHAMPUS established a civilian program of health services, training, special education, and rehabilitation for physically or mentally retarded spouses and children of active duty members of the uniformed services. CHAMPUS payments could be made either directly to the provider of medical treatment or by reimbursement of the recipient of such treatment.

The Center was established and operated under an official Air Force program called "Children Have A Potential" (CHAP). According to Air Force manuals, the CHAP program was—

designed to provide assistance to eligible military personnel and their spouses who have unmarried children who are emotionally disturbed or physically or mentally handicapped and are incapable of self-support. This assistance may be in the form of counselling, referral, special assignment consideration, special medical or educational assistance, and/or financial assistance.

CHAP sponsorship and monitoring of the Center included review of the Center's budget on the basis of need, documentation, and professional ethics. CHAP had power to disapprove Center budget requests for other than financial reasons. The decision that the Center begin charging fees was approved by CHAP in consultation with AFAS, over the opposition of Center personnel. The employment contracts used by the Center were based on models drafted by CHAP in or about 1966 as a pattern for all new projects it supervised.

Center requests for AFAS funds were forwarded and approved through military channels. The hospital commander in Wiesbaden would approve a request and send it to the surgeon at the United States headquarters of the Air Force; it would then go to CHAP for approval, then to the AFAS section at the Military

Personnel Center at Randolph Air Force Base, Tex., then to the AFAS national headquarters. The funds themselves would travel the same path in reverse to get to the Center. The Center's operations were subject to audit by the Air Force Comptroller General; they were not audited by AFAS.

When fees began to be charged by the Center, they were set as outlined in a Center request for CHAP group financial assistance:

the basic amount [is] * * * the income tax paid the previous year. One per cent of the total income tax paid is the basic measure * * *. If an individual or a family is seen they will pay this basic figure per visit with the following exceptions. The minimum amount of money shall be $1.00. The maximum shall be $10.00. Evaluations will be paid at the same rate except that for any one category, the total cost of an evaluation shall not exceed one-half times one per cent of the income tax times ten. The minimum cost for a complete evaluation shall be $2.50. Following the evaluation, if the family is seen in any prolonged period, they should be charged at the rate of one per cent of the income tax per visit. For this latter purpose only, a visit may include any number of family members seen on a particular day.

Of the fees, parents paid the first $50 and 20 percent of all additional charges. CHAMPUS paid the remaining 80 percent of the additional charges. In 1969, the Center's operating expenses were approximately $100,000. Of that amount, AFAS paid $16,414.54. The difference came from fees charged by the Center. From April 1968 to July 1969, parents paid $26,855, and CHAMPUS $47,189.

Fees were charged, in part, so that AFAS grants to the Center could be reduced. AFAS grants were never in excess of the Center's actual budget requirements: Surplus funds at the end of a grant period were deducted from the next AFAS payment. When the Center began receiving appropriated funds for its operations in January 1972 and AFAS payments were discontinued, the Center refunded to AFAS unspent funds received from the latter.

### ULTIMATE FINDING OF FACT

The USAFE Child Guidance Center was an agency of the United States within the meaning of section 911(a)(2), I.R.C. 1954.

### OPINION

The issue before the Court is whether petitioners were entitled by section 911(a)(2), I.R.C. 1954,[3] to exclude from gross income

---

[3] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

on their 1969 Federal income tax returns amounts earned as employees of the United States Air Force Europe Child Guidance Center in Wiesbaden, Germany. The parties have stipulated that resolution of this case depends upon whether the Center is covered by the language of section 911(a)(2) which excepts from exclusion amounts paid "by the United States or any agency thereof."

We conclude that the Center was an agency of the United States and that petitioners' compensation received therefrom was taxable.

As this Court stated in *Cecil A. Donaldson*, 51 T.C. 830, 836 (1969):

> Section 911(a) was enacted for the purpose of promoting foreign trade, inducing Americans with technical expertise to accept employment overseas, and placing American businesses abroad on an equal footing with foreign competitors. See *Swenson* v. *Thomas*, 164 F. 2d 783 (C.A. 5, 1947); Comment, "Section 911(a)(2) Exemption Held Unavailable to Government Employees," 42 N.Y.U.L.Rev. 183 (1967). In furtherance of these purposes, and in an attempt to eliminate abuses of the use of the exclusion, the exception for "amounts paid by the United States or any agency thereof" was incorporated into the section. Although the legislative history of the exception refers specifically only to salaries of military personnel, ambassadors, and consular officials paid directly by the United States, the scope of the exception is broader; otherwise, the phrase "or any agency thereof" is surplusage. See *Krichbaum* v. *United States*, 138 F. Supp. 515, 519–523 (E.D. Tenn. 1956), for an extensive review of the pertinent legislative history.

See also *Lief J. Sverdrup*, 14 T.C. 859 (1950).

In *Morse v. United States*, 443 F. 2d 1185, 1188 (Ct. Cl. 1971), the Court of Claims abstracted from the opinions of this Court in *Donaldson* and in *Frank E. Raffensperger*, 33 T.C. 1097 (1960), the following qualities of United States "agency" for purposes of section 911(a)(2):

SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.
(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

* * *

(2) PRESENCE IN FOREIGN COUNTRY FOR 17 MONTHS.—In the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such 18-month period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

The elements of control, with power to initiate and terminate, with effectuation of Government purposes paramount over those of organizers and members, the exclusion of private profit, and the limitation of membership to Government-connected persons, serve to identify an "agency." This excludes such institutions as national banks having overseas branches, which, although chartered by the Government and regulated thereby, exist to earn a profit by serving the needs of the public generally. * * *

We find these elements of an agency present here.

The record shows that Air Force control over the Center and its personnel was pervasive. The Center was initiated by the commander-in-chief of the Air Force in Europe to satisfy a specific need of his command—the proper care of dependent, handicapped children of Air Force personnel in Europe. Its name included the letters USAFE. The Center was under the formal supervision of an Air Force psychiatrist, who was in turn under the supervision of the commander of the Air Force hospital in Wiesbaden, Germany. The Center was established and operated under an official Air Force program called "Children Have A Potential" (CHAP), which monitored and reviewed the Center's budget on the basis of need, documentation, and professional ethics. CHAP had the power to disapprove Center budget requests for other than financial reasons. Nor was CHAP limited in its supervisory authority over the Center to reacting to Center budget initiatives, as shown by the fact that CHAP, in consultation with the Air Force Aid Society, made a decision that the Center would begin charging fees and required the Center to implement that decision over the opposition of at least some of the Center's personnel, including its chief civilian psychiatric social worker.

The Center's three basic sources of funds were all subject to military control and influence. Initially, and to a reduced extent in the year in issue, a substantial portion of the Center's funds came from grants by the Air Force Aid Society (AFAS). AFAS appears itself to be subject to considerable military influence.[4]

---

[4] AFAS, though a civilian corporation formed under the laws of the District of Columbia, is, and was in the year at bar, the official emergency relief organization of the Air Force. Four of the 15 AFAS trustees are ex officio Air Force personnel, including the Secretary of the Air Force, the Air Force Chief of Staff, the Air Force Deputy Chief of Staff (Personnel), and the Comptroller of the Air Force. Two other trustees were also ex officio: the wife of the Chief of Staff and the Director of the Air Force Aid Society. The AFAS director was at all times pertinent here, a retired Air Force general. Administration of AFAS activities at Air Force installations is performed by Air Force officers and enlisted men assigned that duty by their installation commanders. AFAS funds are derived in part from an annual fund-raising campaign conducted by the Air Force on its own installations and administered by Air Force officers. Moreover, it is clear that the initial request by the

More importantly, however, Center requests for AFAS grants had to be cleared through military channels, including approval by CHAP and the surgeon at the United States headquarters of the Air Force, before they could even be submitted to AFAS. The Air Force itself paid, from funds appropriated by Congress, for the salary of the military psychiatrist in charge of the Center and for the office space, supplies, utilities, and equipment used by the Center. Most of the rest of the Center's funds, beginning in March 1968, came from fees charged parents of children treated at the Center. The decision to charge fees was, as *supra,* made by CHAP in consultation with AFAS, despite the fact that Center personnel opposed the decision, which, we believe, again emphasizes the degree of military control over the Center's operation. About two-thirds of the fees charged parents were reimbursed by the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), a United States Government health care program organized under title 10, chapter 55, U.S.C., whose funds were provided by the Government.

The Center's employment contracts, including those signed by petitioners Dorothy M. Kalinski and Carol Marie Schmidt, bound Center employees to "be subject to military law, including but not limited to applicable rules, regulations, and directives issued by competent US military authorities, to the same extent * * * as * * * any US citizen employees paid from appropriated funds by the Air Force." Center employees contracted to conform to "the same standards of conduct and rules of discipline as are applicable to US citizen employees paid from appropriated funds." Center holidays were those "observed by the USAF and its US citizen [appropriated fund] employees." Further, the contracts specified that employee grievances not satisfactorily settled by the Center director, himself an Air Force officer, could be appealed to the Wiesbaden installation commander, whose decision was to be final.

Nothing in the record indicates that the Center or its employees had purposes other than accomplishing the goals of the Air Force in establishing the Center. Nothing in the record indicates that the Center did or was intended to operate at a

Air Force commanding general in Europe, for $160,800 in AFAS funds to start the Center, was regarded in large measure by him as a quid pro quo for money raised in the annual campaigns by Air Force personnel in Europe.

profit. The fees charged by the Center were measured by a percentage of its patients' families' income tax—they were not related to the Center's operating costs. Any unexpended portions of an AFAS grant payment were deducted from the next payment. And when the Center began receiving funds appropriated by Congress in January 1972, surplus AFAS funds were refunded to AFAS. The record indicates, further, that the Center's services were available only to children of Air Force personnel.

In sum, the Center was established and operated under pervasive Air Force financial and supervisory control, solely to effectuate Air Force purposes, on a nonprofit basis, limited to Air Force-connected persons. Under *Morse v. United States, Cecil A. Donaldson,* and *Frank E. Raffensperger,* all *supra,* we conclude that the Center was an agency of the United States for purposes of section 911(a)(2).

Petitioners argue that even if the Center was an agency of the United States, the earnings in question are still excludable under section 911(a)(2), on the theory that the Center was a mere conduit for funds actually "paid" to petitioners by the AFAS and other private sources.

We need not inquire here whether AFAS itself constituted an agency of the United States,[5] for we disagree with petitioners' premise that the Center did not itself pay the salaries of petitioners Dorothy M. Kalinski and Carol Marie Schmidt. Petitioners cite *Krichbaum v. United States,* 138 F. Supp. 515, 518 (E.D. Tenn. 1956), to the effect that "Payment in a legal sense relates to a debt or an obligation of the party who pays. Payment may be made by the debtor or by another in his behalf. If it is paid by another, but with the debtor's money, it is payment by the debtor." Here, however, all indications are that the Center was in fact the true payor of petitioners' salaries. The employment contracts signed by Dorothy M. Kalinski and Carol Marie Schmidt ran directly from the Center, "represented by the Custodian of the Central Base Fund," to each of the two petitioners. Reuben Sanders, assistant secretary of the AFAS in the year at bar, testified credibly that the AFAS did not contract individually with, or have any obligation to, Center employees, and nothing in the record implies differently. Nor does the record show that any other source of the Center's funds had financial ob-

---

[5] Although we note that, as per n. 4 *supra,* Air Force influence and control over AFAS funds, operations, and goals appear to have been substantial.

ligations directly to the Center's civilian employees. Concerning the obligation to pay salaries of the Center's civilian employees, the Center itself was the obligor and the payor.

The other argument advanced by petitioners is that the Center was not an agency of the United States because it was neither an "appropriated fund activity" nor a "nonappropriated fund activity." [6] Petitioners cite *Brummitt v. United States*, 329 F. 2d 966 (Ct. Cl. 1964), in which the court found a U.S. Army officers' mess in Taipei not to be a nonappropriated fund activity and concluded that it was not an agency of the United States for purposes of section 911(a)(2).

If it were necessary to resolve this question, on the basis of the record before us we would find that the Center was a nonappropriated fund activity. In addition to the facts already adduced as showing the Center to be a United States "agency," we note that the Center's employment contracts stated the Center to be a nonappropriated fund activity and that the Center appears to have been established and operated consistently with the provisions of Air Force Regulation 176-1, entitled "Nonappropriated Funds, Basic Responsibilities, Policies and Practices." See *Frank E. Raffensperger, supra,* and *Chester D. Taylor, Jr.,* T.C. Memo. 1971-53, cited by respondent. We would not find the testimony of two witnesses formerly connected with the Center introduced by petitioners that in their opinion the Center did not constitute a nonappropriated fund activity, sufficient to overcome the evidence noted above.

We believe the factual evidence clearly indicates that the Center is encompassed within the definition of a "nonappropriated fund" used in the Auditor General's training manual stipulated into evidence in this case, which is "an entity established by authority of the Secretary of the Air Force for the purpose of administering [and utilizing] moneys not appropriated by Congress for the benefit of military personnel and their dependents and civilian employees." See also *Frank E. Raffensperger, supra* at 1105. Because the Center was a relatively new concept in the Air Force and somewhat unique, there may be some uncertainty as to which particular category of "Nonappropriated Funds" set forth in section A, paragraph 2, of Air Force Regulation 176-1 (1968), it falls within but, because it was established by the Air Force specifically to meet an Air Force

---

[6] The meaning of these terms is discussed in our findings of fact.

welfare and morale problem, and was supervised and controlled by the Air Force, we believe it would come under the "Non-appropriated Fund" classification rather than the "Private Association Funds" classification dealt with in paragraph 6 of the regulation, as argued by petitioner. The fact that the Center became an "Appropriated Fund" activity in 1972 supports this conclusion.

However, we do not reach the question of the Center's status as a nonappropriated fund activity, because we believe petitioners' reliance on that argument and on *Brummitt* to be misplaced. It may be—although this question was left undecided by *Brummitt*—that military nonappropriated fund activities automatically qualify as United States agencies under section 911(a)(2). See *Frank E. Raffensperger, supra.* It does not follow, however, that if an entity is not a nonappropriated fund activity it may not still be a United States agency—the latter remains a question of fact to be determined under all the circumstances before the Court.[7] We note in addition that in *Morse v. United States, supra,* the Court of Claims considered *Brummitt* and distinguished it factually, citing the lack of Government purpose, control, and supervision of the officers' mess in question:

It was a private club formed by its members for their own purposes, on their own initiative. During the taxable year neither the Army nor the members considered the club to be governed by Army Regulations, there was no official review or audit of either policy or operations, and membership was unrestricted. * * * [443 F. 2d at 1187.]

The Court of Claims then elected to follow the decision of this Court in *Cecil A. Donaldson, supra,* as "soundly reasoned and correctly decided." While the Court of Claims did not overrule *Brummitt,* we believe that case is thus of considerably weakened authority, and as we also find its facts to be distinguishable from those at bar, we adhere to our conclusion herein and to the approach taken in the *Donaldson* and *Morse* cases.[8]

*Decisions will be entered for the respondent.*

---

[7] Compare, however, *Chester D. Taylor, Jr.,* T.C. Memo. 1971–53.

[8] See *Donald R. Dykes,* T.C. Memo. 1971–266.