Chester D. Taylor, Jr., and Rita K. Taylor v. Commissioner.
Taylor v. Commissioner
Docket No. 516-70 "SC"
United States Tax Court
T.C. Memo 1971-53; 1971 Tax Ct. Memo LEXIS 273; 30 T.C.M. (CCH) 233; T.C.M. (RIA) 71053; March 29, 1971, Filed. Chester D. Taylor, Jr., pro se, 911 W. Madison St., Mascoutah, Ill.Charles B. Tetrick, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for *274 the calendar years 1964 and 1965 in the amounts of $332.99 and $336.18, respectively. The only issue for decision is whether petitioners are entitled, under the provisions of section 911(a)(2), I.R.C. 1954, [1] to exclude from their gross income for the calendar years 1964 and 1965, the salary received by Rita K. Taylor as a kindergarten school teacher at Clark Air Base in the Republic of the Philippines. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife and are and at all times relevant to this case have been citizens of the United States. Their legal residence at the time the petittion in this case was filed was Mascoutah, Illinois. They filed their joint Federal income tax returns for the calendar years 1964 and 1965 with the district director of internal revenue, St. Paul, Minnesota. Chester D. Taylor, Jr., is and has been since June 28, 1952, a Commissioned Officer on extended active duty with the United States Air Force. Petitioner Rita K. Taylor (hereinafter referred to as petitioner) is and has been since July 11, 1953, the wife of Chester *275 D. Taylor, Jr. Prior to her marriage, petitioner had received a college degree in Physical Education and English and had been employed in Minnesota as a teacher of Physical Education and English during the years 1951, 1952, and part of 1953. From time to time since her marriage, petitioner has been employed as a school teacher, either on a full-time or substitute basis. Shortly after petitioner's marriage her husband was stationed in Wiesbaden, Germany and petitioner was employed there as a teacher of Army personnel. During the month of May 1962, while serving at Wright-Patterson Air Force Base in Ohio, Chester D. Taylor, Jr., received orders from the Air Force, transferring him to Clark Air Base, Republic of the Philippines. Petitioner and petitioners' children arrived in the Republic of the Philippines in July 1962. Thereafter until July 19, 1965 petitioners with their children resided at Clark Air Base, Republic of the Philippines. Clark Air Base had a dependents school system which was supported by United States appropriated funds. This dependents school system was composed of an elementary school and a high school which were under the direction of a superintendent employed *276 for that purpose by the United States Air Force. Each school also had a principal. Most of the regular teachers for these dependents schools were employed by the Air Force in the United States for the purpose of teaching in the dependents schools at Clark Air Base in the Philippines. However, a few of the teachers 234 would be employed through the Central Base Personnel Office of Clark Air Base. The teachers employed by the personnel office at the Base were wives of civilian or military personnel stationed at the Base. In 1963 petitioner obtained an interview with the superintendent of the dependents schools of Clark Air Base for the purpose of applying for a position as a substitute teacher in the dependents schools. She was interviewed by the superintendent of the dependents schools and then went to the Central Base Personnel Office where she filled out a "Form 57" giving her experience as a teacher and her references. She was then employed through the Central Base Personnel Office as a substitute teacher in the dependents schools and filled out various forms including one for withholding income taxes and took the loyalty oath. The Central Base Personnel Office at Clark Air *277 Base was charged with the responsibility for the employment of civilian personnel at the Base. During the school year 1963-1964, petitioner taught on a number of days in both the elementary school and the high school at Clark Air Base. When petitioners arrived at Clark Air Base in 1962, there was in operation on the Base a kindergarten. Petitioner had a son in the kindergarten the first year that her husband was stationed at Clark Air Base. The teacher whom petitioner considered to be in charge of the kindergarten during that year was the wife of a sergeant stationed at Clark Air Base. During the school year 1963-1964, petitioner taught in the kindergarten as a substitute on several occasions. During the year 1963-1964, petitioner considered a teacher by the name of Barbara Siggins to be the teacher in charge of the kindergarten. Barbara Siggins was the wife of an officer stationed at Clark Air Base. Sometime prior to the fall of 1964, petitioner talked to Barbara Siggins about the possibility of obtaining a position as a teacher in the kindergarten school for the school year 1964-1965. Petitioner stated that having substituted in the kindergarten, she believed she was capable *278 of teaching at that level on a full-time basis. She explained that although kindergarten teaching was not her special field she felt that because of her teaching experience in speech and physical education she could handle the work in the kindergarten and that the hours would be better for her than the hours as a substitute teacher in the dependents schools. Barbara Siggins told petitioner to go to the Central Base Personnel Office and tell one of the employees of that office that she would like a position during the 1964-1965 school year as a full-time teacher in the kindergarten school. Petitioner went to the Central Base Personnel Office where all her papers were on file in connection with her employment as a substitute teacher in the dependents school system during the school year 1963-1964 and told one of the personnel officers she would like a full-time teaching position in the kindergarten school. Petitioner was then hired as a full-time kindergarten school teacher for the school year 1964-1965. The person to whom petitioner talked at Central Base Personnel Office told petitioner the amount of salary she would receive based on her college degree and teaching experience. He *279 told her that since she had no experience in the kindergarten field, she would start at the lowest level of salary paid to kindergarten school teachers with a degree. From September 1964 until June 1965, petitioner was employed as a kindergarten school teacher at Clark Air Base. Her salary was paid from the "Kindergarten School Fund." Petitioner received salary from the Kindergarten School Fund in the amount of $1,768.08 for the taxable year 1964 and $1,845.12 for the taxable year 1965. The Fund withheld United States income tax from petitioner's salary. She was furnished each year with a "form W-2" which in the space provided for the employer's name, identification number, and address, contained the following: 98-0000584 KINDERGARTEN SCHOOL FUND 405th Air Base Group, APO 96274 c/o PM, San Francisco, California
The administration of the Kindergarten School Fund by which petitioner's salary was paid was by a council designated by the Base Commander of Clark Air Base and the Fund was subject to audit by the Base Central Accounting Office. The sole source of income for the Kindergarten School Fund was tuition payments of $12 per month per child by the parents of the children *280 voluntarily attending the kindergarten school. Dependents of American citizen military and civilian employees at Clark Air Base who would be 5 years old by December 31 of the year 235 of enrollment were eligible to attend the kindergarten school. Approximately 500 children were enrolled annually in the kindergarten. Tuition payments were made monthly by the parents directly to the Kindergarten School Fund. This payment was a requirement for attendance by a dependent at the school. The Kindergarten School Fund maintained its own United States dollar account in the Clark Air Base Branch of the First National City Bank of New York and the only funds deposited in this account were the tuition payments by parents of the children attending the kindergarten school. There was no commingling of the funds generated by the tuition payments with the funds of the United States, either appropriated or nonappropriated, in this bank account. The salaries of all teachers in the kindergarten school were paid from the Kindergarten School Fund. A Philippine national bookkeeper was employed by the Kindergarten School Fund and his salary was paid by the Fund in Philippine pesos which were purchased *281 by the Fund. The Kindergarten School Fund also employed a Philippine national janitor whose salary was likewise paid in Philippine pesos which were purchased by the Fund. Expendable supplies for use by teachers and children such as books and paper needed for operation of the kindergarten school were purchased from the Kindergarten School Fund as well as equipment such as tables, chairs, desks, audio visual equipment, and the like. The Kindergarten School Fund utilized the Army Post Office and Base Exchange facilities for the acquisition of some of its supplies and equipment. Much in the way of significant school equipment items was purchased from Philippine commercial sources. The Kindergarten School Fund was operated on a nonprofit basis. Any surplus accumulated during a year was used to upgrade equipment and supplies and to improve the quality of the educational services provided by the kindergarten school. The principal of the elementary dependents school at Clark Air Base visited the kindergarten school from time to time. All of the kindergarten teachers including petitioner each morning signed a roster in the outer office of the principal of the elementary dependents school *282 and again signed this roster when they left for the day. Barbara Siggins who served in the capacity of a supervisor at the kindergarten school would generally see the principal each day when she would stop in the dependents school to see the kindergarten's secretary. When she came in, he would be standing at the secretary's desk. When she was talking to the secretary to find out if the kindergarten school had any new pupils and how many pupils were behind in their payments, he would sometimes give her advice in connection with collecting delinquent payments. Sometimes he would advise her as to the approximate cost of some item for use in the kindergarten school. The principal of the dependents school would occasionally come to the kindergarten and observe a class being taught or make some comment with respect to a project a class was working on or give some advice with respect to the operation of the kindergarten school. There were two sessions per day of the kindergarten and each teacher taught two sessions a day. The first session began at 8:00 a. m. and ended at 10:15 a. m., and the second began at 10:45 a. m. and ended at 1:00 p. m. The kindergarten classes were taught Monday *283 through Friday as were the classes in the dependents school system. The kindergarten school year also corresponded with the school year of the dependents school system, and the kindergarten school recognized the same holidays as did the dependents school system. Diplomas or certificates were awarded to the children who completed the kindergarten curriculum. The kindergarten school occupied five quonset huts owned by the United States Air Force which were located on the Base in the same area as the ten quonset huts used by the elementary school of the dependents school system. The kindergarten school used a portion of the same playground utilized by the dependents schools. The utilities of the kindergarten school such as water and electricity were furnished by Clark Air Base and the washroom supplies used by the kindergarten were furnished by the Air Base. At the beginning of the 1964-1965 school year there were nine teachers in the kindergarten school, but about the middle of October a tenth teacher was employed at the suggestion of Barbara Siggins. Barbara Siggins was paid the same salary as any other teacher in the kindergarten with her educational qualifications and experience. *284 She was paid no extra amount for acting as supervisor. Barbara Siggins believed that at some time she had read a constitution and bylaws of the kindergarten school but was not positive that she had. Petitioner had not read any constitution or bylaws of the kindergarten school and did not know 236 whether the kindergarten operated under a constitution and bylaws. During the years involved in this case Pacific Air Force Regulation 214-1 (hereinafter referred to as PACAFR 214-1) dated July 13, 1962, was in effect for certain Pacific Air Force installations including Clark Air Base. PACAFR 214-1 was entitled, "Dependents' Education Kindergartens and Nursery Schools." Its stated purpose was to authorize the establishment, operation, and maintenance of kindergartens and nursery schools and the use of nonappropriated funds for their support. This regulation provided that the commanders of the Fifth and Thirteenth Air Force (Clark Air Base was in the Thirteenth Air Force) were responsible for publishing policy and operational directives consistent with its provisions for kindergartens at installations under their jurisdiction and that installation commanders were responsible for the *285 establishment, discontinuance, operation and control of kindergartens. This regulation further provided that dependents school principals are responsible to installation commanders for the direct administration and supervision of kindergartens and personnel of kindergartens attached to their schools. The regulation provided that kindergartens may be established on a self-sustaining basis on request of the sponsors of not less than 15 eligible dependents. This regulation provided with respect to kindergarten funds in part as follows: 5. Funds: a. Kindergartens will be supported by kindergarten sundry funds in accordance with paragraph 2c(7), AFR 176-1, 10 September 1957, as amended. * * * Such funds and accounts will be derived from fees, donations and proceeds of authorized fund-raising activities allocated thereto by installation commanders. b. Each kindergarten sundry fund will be administered by a council designated by the installation commander. * * * The dependents school principal * * * will be a member of the kindergarten sundry fund council. c. Each kindergarten sundry fund council * * * will prepare and submit, as required by and for the approval of the installation *286 commander, annual and/or periodic financial plans for kindergarten * * * school support. Such plans will show estimated enrollment, proposed expenditures, proposed tuition rates, estimated receipts from fees and proposed additional sources and amounts of income to meet estimated expenditures. The regulation also provided that kindergarten classes would be taught by locally employed dependents who were qualified and experienced kindergarten or primary grade teachers and who were recommended for employment by the dependents school principal. It further provided that kindergarten teachers would be compensated at the hourly rate of pay computed for GS-7 civilian employees, not to exceed 3 1/2 hours per session or 7 hours per day of actual service in the kindergarten or in preparation for kindergarten instruction. The regulation further provided that all dependents of military and civilian personnel residing at or near the Air Force installation who would reach the age of 5 years on or before December 31 of the current school year, upon payment of the prescribed tuition fees, could attend available kindergarten classes. It also provided that kindergarten classes may be held during the *287 morning and/or afternoon and that such classes would not be less than 2 hours nor more than 2 1/2 hours including recesses. It further provided that kindergarten teachers would employ the prescribed Curriculum Guide for kindergartens and that certificates of completion would be awarded to children who satisfactorily completed the kindergarten curriculum. PACAFR 214-1 was amended by PACAFR 214-1A on October 2, 1963, and by PACAFR 214-1B on February 7, 1964. Both of these amendments dealt with the qualifications and standardized compensation rates for kindergarten teachers. On July 13, 1962, when PACAFR 214-1 was issued, paragraph 2 of AFR 176-1, as amended, was entitled "Categories of Nonappropriated Funds and Activities." Paragraph 2.c(7) of AFR 176-1 dated 10 September 1957, as amended by AFR 176-1A dated 4 January 1960, provided as follows: 2c(7). Other sundry activities, associations, and funds. (See AFR 176-11 and AFM 177-4.) This Air Force regulation was also amended on January 31, 1960, and was superseded by AFR 176-1 dated 7 February regulation paragraph 3 covered "Authorized 1964. [2] Under this modified 237 regulation paragraph 3 covered "Authorized Categories and *288 Types of Nonappropriated Fund Instrumentalities." Paragraph 3 of this modified regulation contained in general the same provisions as paragraph 2 of the prior regulation. AFR 176-1 dated 7 February 1964, was amended on June 10, 1964, November 18, 1964, and March 22, 1965, but none of these amendments dealt with the above-quoted paragraph. AFR 176-1 as amended and modified provided for three categories of nonappropriated funds. The first category provided for was for the income-producing funds and activities such as base exchange and motion pictures, and the second was the welfare funds such as the Air Force Central Welfare Fund, the Major air command welfare funds, amjor subcommand welfare funds, central base funds, unit funds, and civilian welfare funds. *289 The third category was "Sundry funds" and the activities listed included mess funds of various types, chaplain funds, and "sundry funds" provided for in the above-quoted language. AFR 176-1 as amended and modified provided that a "nonappropriated" fund activity was an instrumentality of the United States and that it was for the purpose of providing support in enhancing morale-building programs. AFR 176-1 as amended and modified also provided for funds and activities not covered by the regulation and not included in "nonappropriated funds." These funds were stated to include but not be limited to the Air Force Aid Society, the Air Force Central Hospital Fund, Prisoner of War Funds, Patients' Trust Funds, and Prisoners' Personal Funds, and exempt private organizations. Exempt private organization funds were those which were organized, established, and operated by individuals acting outside their official capacity as officers, employees, or agents of the Government, for a purpose other than to provide essential morale-building welfare, and recreational facilities and services. They include credit unions, labor union locals, posts of veterans' organizations, fraternal societies, and *290 similar organizations governed by agencies not under Air Force control. AFR 176-1 as amended and modified also provided that the consent of the Commander must be received in writing before a private association may be established and that the consent of the Commander will be contingent on a number of conditions including the condition that the constitution and bylaws, charter, or articles of agreement provide for disposing of residual assets and liabilities when the association is dissolved. The regulation provides that these organizations are not instrumentalities of the United States. AFR 176-11, as amended, was entitled "Nonappropriated Funds" and contained regulations on "how to establish, finance, operate, and dissolve Air Force openmesses and other sundry association activities." Section G of AFR 176-11, as amended, provided in part as follows: SECTION G - OTHER SUNDRY ASSOCIATION FUNDS 36. What They Are and What They Do. Other sundry association activities and funds thereof are instrumentalities of the United States Government as defined in AFR 176-1. They are established for the benefit of military personnel and their dependents to augment, assist or promote base messing, *291 billeting, recreation, and morale programs. Criteria to identify other sundry association activities include: a. Established under a constitution and bylaws. b. Active membership is composed of military personnel on active duty, their dependents, eligible civilian employees, or any combination thereof. c. Activities are financed with income derived from the participating membership. d. Dividends or grant assistance is not received from welfare or revenue-producing funds. e. A board or council elected or selected from the membership administers the association. f. Funds of the association are subject to audit. AFR 176-4 dealt with uniform accounting procedures for open messes and other sundry association activities. Petitioner's salary received from the Kindergarten School Fund was not taxed by the Republic of the Hilippines. On their income tax returns for the calendar years 1964 and 1965 petitioners did not include in their income as reported the salary received by petitioner from the Kindergarten School Fund. They attached to each of these returns a Form 2555 "Statement to Support Exemption of Income Earned Abroad" inwhich they claimed that 238 the salary paid *292 to petitioner was exempt from United States income tax because petitioner was physically present in a foreign country for 510 days of a consecutive 18-month period and her salary was paid to her as a private school kindergarten teacher. Respondent in his notice of deficiency increased the income as reported by petitioners for each of the years here in issue by the amount of salary paid to petitioner by the Kindergarten School Fund with the explanation that the amount was taxable as ordinary income. Respondent at the trial conceded that petitioner's salary would otherwise qualify for exclusion under section 911(a)(2) but for respondent's position that the Kindergarten School Fund was an agency or instrumentality of the United States. Opinion Section 911(a)(2)[3] provides that any citizen of the United States who during any period of 18 consecutive months is present in a foreign country for at least 510 full days in such period may exclude from income, earned income attributable to services performed during such period which is received from sources without the United States except amounts paid by the United States or any agency thereof. *293 The parties here agree that petitioner meets the requirements of presence in a foreign country specified in section 911(a)(2) and that the payments she seeks to exclude from income for each of the years 1964 and 1965 were earned by her for services which she performed during the 18-month period in which she was present in a foreign country. The only disagreement between the parties is whether the amounts which petitioner received for her services were paid by an agency of the United States. The parties further agree that the regulations of the Air Force providing that nonappropriated fund instrumentalities are instrumentalities of the United States entitled to the sovereign immunities and privileges of the United States, have the full force and effect of law. See Standard Oil Co. of California v. Johnson, 316 U.S. 481 (1942). The parties also agree that if the Kindergarten School Fund is a nonappropriated fund within the provisions of AFR 176-1, as amended and modified, it is an instrumentality of the United States and the amount paid from this fund to petitioner is to be considered as an amount paid by an agency of the United States under the provisions of section *294 911(a)(2). This agreement between the parties is in accordance with our holding in Frank E. Raffensperger, 33 T.C. 1097, (1960). The issue between the parties is factual and is whether under the facts in this record the Kindergarten Fund is to be considered a nonappropriated fund within the provisions of AFR 176-1 as amended and modified. As we have pointed out in our findings, AFR 176-1, as amended and modified, specifically provides that certain trust funds and funds of private associations which are organized and operated by individuals for purposes other than to provide essential morale building welfare and recreational services and facilities are not nonappropriated funds within the meaning of the Air Force regulations even though the consent of commanders of the installations is required before such an association may be established on an Air Force installation. Since such organizations are not "nonappropriated funds" under the Air Force regulations, they are not agencies or instrumentalities of the United States. Petitioners take the position that they have established by the evidence in the record in this case that the Kindergarten Fund was a private association *295 fund and not a nonappropriated fund instrumentality within the meaning of Air Force regulation 176-1 as amended. Respondent takes the position that the evidence of record in this case has many indications that the Kindergarten Fund was a nonappropriated fund instrumentality operated for essential morale building purposes. 239 Respondent points to the specific provisions of PACAFR 214-1 dated July 13, 1962, authorizing the establishment, operation and maintenance of kindergartens and the use of nonappropriated funds for their support. Respondent also points out that the evidence here shows that the Kindergarten Fund at Clark Air Base was administered by a council designated by the Base Commander and was subject to audit by the Base Central Accounting Office in accordance with the provision of PACAFR 214-1 providing for the establishment of a kindergarten fund for Pacific Air Bases as a nonappropriated fund instrumentality. Respondent further points out that the Kindergarten Fund here has been shown to be operated in accordance with PACAFR 214-1 insofar as the hours of operation of the kindergarten, the persons employed as teachers, and the persons eligible to attend the kindergarten *296 were concerned. Respondent also contends that the evidence here is sufficient to show that the principal of the dependents school exercised some control over the kindergarten school at Clark Air Base. Petitioners argue that the record here fails to show that the kindergarten school was operated under a constitution and bylaws, that the kindergarten received any support other than through the tuition payments made by parents of the children attending the kindergarten, or that the kindergarten had an active membership as is required for a "nonappropriated fund" activity. Respondent contends that a failure of the evidence to show whether there was a constitution and bylaws cannot be considered to be a showing that one in fact did not exist. Respondent contends that the active membership of the kindergarten consisted of the parents of the children who attended. These parents paid the charge for their children's attending the kindergarten. Respondent contends that the record shows there was some support for the kindergarten by the Air Force since the kindergarten did use buildings and a playground that belonged to the Air Force, and washroom supplies were apparently furnished by the *297 Air Force. Petitioner primarily stresses the fact that much in the way of significant school equipments items was purchased from Philippine commercial sources. Petitioner states that this is an indication that the kindergarten was not a nonappropriated fund instrumentality. Petitioner says if the kindergarten had been a "nonappropriated fund," the provisions of AFR 176-1, Sec. B 12.b., would require that it "normally use expendable items available in normal supply channels on a reimbursable basis." Respondent contends that without a showing of the reason for the original decision to acquire school equipment items from Philippine commercial sources and who originally authorized this to be done, this deviation from the normal system of acquiring supplies is insignificant in determining whether the Kindergarten School Fund was a nonappropriated instrumentality of the United States. Respondent contends that all the other evidence in this case indicates that the Kindergarten School Fund was an instrumentality of the United States. Respondent calls attention to the fact that the Kindergarten School Fund did purchase items from the Post Exchange and also ordered items from the United *298 States through the Army Post Office. Considering all the evidence in this case and comparing the facts here present with those in Frank E. Raffensperger, supra; Cecil A. Donaldson, 51 T.C. 830 (1969); and Brummitt v. United States, 329 F. 2d 966 (Ct. Cls., 1964), which cases are relied on by both parties, we conclude that on the basis of the evidence here of record petitioner has failed to establish that the Kindergarten Fund was not a nonappropriated fund instrumentality of the United States. The Raffensperger case involved the Union Club of Tokyo which was located during the year there in issue on property leased by the Board of Governors of the club from the Japanese owners. Assistance in obtaining the lease had been given to the club by the Judge Advocate's Office of the General Headquarters, Far East Command in Japan. We held the evidence in that case to show that the Union Club was a nonappropriated fund instrumentality of the United States. The Donaldson case involved a State Department commissary operated pursuant to a provision of the Foreign Service Act of 1946. We held this commissary to be an instrumentality of the United States. *299 Brummitt v. United States, supra, concluded on the basis of the facts there present that the United States Officers' Open Mess at Taipei was not a nonappropriated fund instrumentality of the United States. In so holding, the Court pointed out that no official Government audit was made of its books, that the club was allowed to retain and accumulate its profits, and that its constitut2on in effect in the year there in issue 240 specifically provided that it was not a nonappropriated fund. In the instant case the record shows that the Kindergarten School Fund was subject to audit by the Base Central Accounting Office, that it was nonprofit, and any funds accumulated in any year were used to upgrade the kindergarten school. We do not have the constitution of the Fund in evidence to determine what it might have provided with respect to the Fund. Petitioner argues that by offering her testimony and that of another teacher in the kindergarten school, she has offered all reasonable available evidence as to the operation of the kindergarten. The testimony of both of these witnesses shows that neither of them was really aware of why the kindergarten was created, what *300 its constitution and bylaws, if any, provided, who was responsible for its operation, or many other facts which would be helpful to the Court in determining whether the kindergarten was a nonappropriated fund instrumentality or was merely a private organization. The testimony of a member of the council, the school principal, or the commanding officer of the Base at the time the kindergarten was organized would be more helpful in this respect. The constitution and the bylaws of the kindergarten, if any, and the audit reports with respect to the Fund would be of some assistance. We recognize, of course, the difficulties which petitioner would encounter in providing such evidence for the Court. However, we cannot assume, as petitioner asks us to do, that facts which are not proven would if proven be favorable to petitioner. Petitioner points to Rev. Rul. 55-384, 1955-1 C.B. 94 as being an indication that all kindergartens at military installations are not agencies or instrumentalities of the United States. This ruling states as follows: Kindergarten and nursery schools organized and operated on United States bases or installations located in foreign countries or possessions *301 of the United States when operated on a permissive basis rather than under official instructions or regulations and the support of which is furnished by the parents of the pupils are not agencies or instrumentalities of the United States within the meaning of section 911(a) or 931(i) of the Internal Revenue Code of 1954 (sections 116(a) 251(j) of the 1939 Code). Accordingly, United States citizens who receive compensation from such organizations are entitled to the benefits accorded by section 911(a)(1) or section 911(a)(2) or section 931 of the Code with respect to such income, provided the provisions of the applicable section of the Code are otherwise met. Compare Rev. Rul. 54-612, C.B. 1954-2, 169. While petitioner may have interpreted this ruling to permit her to exclude the salary she received from the kindergarten school from her income, the ruling in fact specifically refers to kindergartens operated on a permissive basis rather than under official instructions or regulations. The question in this case is whether the Kindergarten School Fund by which petitioner was paid was a nonappropriated fund in that it was operated under official regulations applicable *302 to such nonappropriated fund instrumentality. Therefore the revenue ruling to which petitioner directs our attention is not helpful in the disposition of this case. On the basis of all the evidence of record, but without assuming, as petitioners contend we should, facts which are not in the record would if proven support petitioner's contention, we conclude that the Kindergarten School Fund was a nonappropriated fund instrumentality of the United States Government. We conclude on the basis of the facts of record, that petitioner during the years 1964 and 1965 was paid by an agency of the United States within the meaning of section 911(a)(2) and is not entitled to exclude the amounts which she received from her taxable income. Decision will be entered for respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. AFR 176-1 dated 7 February 1964 was complete in itself and superseded AFR 176-1 dated 10 September 1957, as amended. Certain changes were made in the provisions of the superseded regulation but many provisions in the later regulation were the same or substantially the same as in the superseded regulation. For this reason throughout this opinion we refer to AFR 176-1 dated 7 February 1964 as modifying the prior regulation.↩
3. Sec. 911(a) General Rule. - The following items shall not be included in gross income and shall be exempt from taxation under this subtitle * * * (2) Presence in foreign country for 17 months. - In the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such 18-month period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).↩