LeRoy D. BRUMMITT and Mary A. Brummitt

v.

The UNITED STATES.

No. 406-60.

United States Court of Claims.

March 13, 1964.

Scott P. Crampton, Washington, D. C., for plaintiffs. Jules G. Korner III and Korner, Doyle, Worth & Crampton, Washington, D. C., were on the briefs.

Mitchell Samuelson, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. Philip R. Miller, Lyle M. Turner, and Earl L. Huntington, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DURFEE, Judge.

This is an action to recover income taxes paid by plaintiffs for the calendar year 1959 in the amount of $544.40.

At issue is whether the salary earned by Mrs. Brummitt as an employee of the United States Officers' Open Mess, Taipei, hereafter referred to as USOOMT, was

exempt from taxation under § 911 of the Internal Revenue Code of 1954, 26 U.S.C. § 911, which provided in pertinent part:

> "§ 911.  Earned income from sources without the United States
>
> "(a)  General rule.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:
>
> \*      \*      \*      \*      \*
>
> "(2)  Presence in foreign country for 17 months.—In the case of an individual citizen of the United States, who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States *(except amounts paid by the United States or an agency thereof)* if such amounts constitute earned income (as defined in subsection (b)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph. \*  \*  \*"[1]  [Emphasis added.]

Throughout 1959 plaintiffs, LeRoy D. Brummitt, an Army officer, and his wife, Mary A. Brummitt were present in Taiwan.  Their joint return for the year 1959 reported a taxable net income of $4,590.00 and an income tax liability of $929.80.  The return further disclosed that $1,437.87 had been withheld from salaries paid to plaintiffs and requested a refund of $508.07.  The claim for refund was denied.[2]

No question is here raised whether Mrs. Brummitt was "present in a foreign country or countries during at least 510 full days" during a period of 18 consecutive months.  The only question to be decided is whether Mrs. Brummitt's wages were paid "by the United States or an agency thereof."

It is well established that military nonappropriated fund activities, such as post exchanges, officers' messes, lunchrooms, and even bowling alleys, are instrumentalities of the United States.  cf. Standard Oil Co. of California v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942);  Rizzuto v. United States, 298 F.2d 748 (C.A. 10, 1961);  Pulaski Cab Co. v. United States, 141 Ct.Cl. 160, 157 F.Supp. 955 (1958);  Borden v. United States, 126 Ct.Cl. 902, 116 F.Supp. 873 (1953);  Bleuer v. United States, 117 F.Supp. 509 (E.D.S.C.1950);  Nimro v. Davis, 92 U.S.App.D.C. 293, 204 F.2d 734 (C.A.D.C.1953) cert. denied 346 U.S. 901, 74 S.Ct. 229, 98 L.Ed. 401.  While these cases establish that nonappropriated fund activities are *instrumentalities* of the United States for certain purposes, these cases do not construe § 911 of the Internal Revenue Act of 1954, and they do not establish the proposition that wages received from such a nonappropriated fund activity are "amounts paid by the United States or an agency thereof."  On the contrary, it is established that employees of nonappropriated fund activities are *not employees of the United States*.[3]  In Borden, supra, a suit for salary withheld from an employee of the Army Exchange Service, a nonappropriated fund activity, pursuant to a contract of employment, this court held that the United States could not be sued on a contract of employment signed by the

---

1.  This section was amended by the Revenue Act of 1962 Pub.L. 87–834;  26 U.S.C. § 911.

2.  In fact, an additional assessment of $34.-31 plus $2.02 in interest was made on April 4, 1961.  The assessment was paid.  The parties have agreed that this additional sum should be treated as part of this claim.  (¶10 of Ans.; Tr. 6–7).  The

sum therefore claimed by plaintiffs is $544.40.

3.  For certain limited purposes under certain statutes such employees may be considered employees of the United States.  For example, they are considered employees for Federal unemployment compensation, 42 U.S.C. § 1361.  For discussion and analysis, see Gradall v. United States, Ct.Cl., 329 F.2d 960.

Army Exchange Service. cf. Bleuer, supra; Gradall v. United States, Ct.Cl., 329 F.2d 960. It is scarcely arguable then that such employees are "paid by the United States."

But are nonappropriated fund-activity employees paid by "an agency" of the United States? The question whether a nonappropriated fund activity is an agency of the United States as contemplated by § 911 of the Internal Revenue Code is interesting, but may not need definitive resolution here. The question presented to us by the parties is whether this officers' mess, USOOMT, was in fact a nonappropriated fund activity in 1959. If it was not, the status of nonappropriated fund activities vis-a-vis § 911 becomes a moot question, at least in this case. Accordingly, we wil examine the nature of USOOMT.

USOOMT was formed as a club on January 27, 1953, by 93 individuals. Though a stock issue was planned, and indeed subscribed to, no stock was ever issued.[4] Rather, the necessary funds were obtained through issuance of $50.00 six percent bonds to the members. The club was constructed on land owned by the Bank of Taiwan with funds borrowed from that bank. From 1953 through 1959, the membership reserved to itself full authority over the club's constitution and by-laws. The membership was in no way limited to service personnel. The club consistently operated at a profit. Its funds were deposited in a Texas bank and its books were audited by an independent civilian Chinese certified public accountant.

On May 24, 1960, the Staff Judge Advocate of the Military Assistance Advisory Group issued a report entitled "Status of USOOMT" which stated in part:

"* * * The USOOMT is not a nonappropriated fund club, its employees are not paid with money belonging to the United States, its agencies or instrumentalities. As a private club the U.S.O.O.M.T. does not receive financial support from nonappropriated funds and neither the United States nor its Armed Forces have any right to supervise or audit the U.S.O.O.M.T. No right exists for the United States Armed Forces to force compliance with any regulations in that, in addition to being a private club, it is not located on a United States installation."

Subsequent to this report, on January 9, 1961, the Deputy Chief of Staff, Headquarters, MAAG requested "that the USOOMT be operated henceforth, generally in accordance with AR–230–60 as a nonappropriated fund open mess."

Accordingly, the constitution was rewritten to *expressly* make USOOMT a *nonappropriated fund activity*. The new constitution was adopted in 1961 by the club membership.

In determining whether the USOOMT was a nonappropriated fund activity prior to the new constitution which expressly made it so, we might first discuss the concept of control as exercised over the club by the military commandant of the area. Concededly, considerable control was exercised over USOOMT. But command of a military area requires that a certain degree of control be exercised over the personnel and activities within and related to the command. Compounding the problem of analyzing Governmental control exercised in regard to this club is the fact that the initial constitution of the club specified that operation and administration of the club would generally follow the principles set forth in Army Regulations which controlled *nonappropriated fund activities*:

"ARTICLE III—OPERATING
REGULATIONS

"Although *this organization is not a nonappropriated fund* it will follow generally the basic principles

4. In 1953, the U.S. Staff Advocate General opined that a club having a nonappropriated fund activity status could not issue stock under Army regulations. But the club never received nonappropriated funds, as none were available.

for administration and operation established by Army Regulations 230–60, dated 26 July 1956 and Air Force Regulations 176–11 dated 22 June 1956 as changed." [Italics supplied.]

Thus, by agreement among the members, the club took on some of the indicia or characteristics of a nonappropriated fund activity.

But while USOOMT did possess some of the characteristics of a nonappropriated fund activity by reason of both the command control it was subject to, and the regulations it was guided by; and while USOOMT did receive benefits from the military such as the loan of equipment and the assignment of personnel, other more convincing factors militate against a determination that the club was in fact, at that time, a nonappropriated fund activity. No nonappropriated funds were ever made available to the club. Though the club operated at a considerable profit, it was allowed to retain and accumulate its profits. Such retention and accumulation of profits by nonappropriated fund activities was proscribed by Army Regulations AR–230–60, § I, 4, d, (3).

■ Though the club did employ a private civilian Chinese certified public accountant to audit its books, no official Governmental audit, as required by regulation, was ever performed (AR–230–60 § I, 9, b). In short, no fiscal control over the club was ever exercised by the military command. Lending further weight to our conclusion that USOOMT was not a nonappropriated fund activity are the following factors—the club was not located on or in a military installation, but was constructed on land independently owned; the club negotiated its own construction loan, and its lease for which it alone was responsible. The club membership was not restricted in any way—officers, civilians, Government employees, foreign nationals—all were entitled to membership.

The totality of all these factors leads us to the conclusion that the club was not established as a nonappropriated fund activity; was not treated as a nonappropriated fund activity and was not deemed to be a nonappropriated fund activity by either the membership or the military command. We are not prepared to say that despite all this, the club was a nonappropriated fund activity.

■ Defendant urges, however, that the benefits received by the club from the Government—the use of Government equipment; the privilege of duty-free import of foods; use of Post Office and Post Exchange facilities; the assignment of personnel to the club—are sufficient to overcome the factors we discussed above. But we do not believe that these benefits received by the club should be given conclusive weight on whether the club was, or was not, a nonappropriated fund activity. Other organizations which are clearly not nonappropriated fund activities receive similar benefits. Quite recently, the Commissioner of Internal Revenue ruled that an overseas employee of the American Red Cross was entitled to the § 911 exclusion at issue here. In the course of that opinion, Revenue Ruling 60–36, 1960–1 Cum.Bull. 279, the Commissioner pointed out that Red Cross employees can be furnished transportation, meals, and quarters, office space, warehousing, wharfage and communications by the Government. Yet, the Government-conferred benefits do not make the Red Cross an agency of the United States. We do not believe that similar benefits conferred on this club make it a nonappropriated fund activity.

As we pointed out above, our determination that this club was not a nonappropriated fund activity makes it unnecessary to consider whether a nonappropriated fund activity is an agency of the United States within the meaning of § 911 of the Internal Revenue Code of 1954.

From the foregoing, and upon the Commissioner's findings of fact which are adopted as the findings of the court, we conclude that plaintiffs are entitled to recover, and judgment is accordingly entered for plaintiffs in the amount of $544.40.