Arnold A. MORSE, Sr., and
Hellen V. Morse

v.

The UNITED STATES.

No. 357–69.

United States Court of Claims.

June 11, 1971.

Carl J. Felth, Washington, D. C., attorney of record, for plaintiff.

Robert N. Dorosin, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant.

Before COWEN, Chief Judge and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFFS' MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT, AND DEFENDANT'S MOTION FOR JUDGMENT ON ITS COUNTERCLAIM

NICHOLS, Judge.

Petitioners say they are American citizens, husband and wife, suing as joint taxpayers for refund of income tax paid for the year 1966, in the amount of $2,-287.67. Mrs. Morse, who had no income of her own, is joining in this action solely because of her participation in the joint return. Reference hereinafter to "plaintiff" is intended to mean Mr. Morse only.

Plaintiff filed with the Commissioner of Internal Revenue a timely claim for refund of $1,533.38, withheld from his salary. The Commissioner denied the claim for refund and assessed a deficiency of $754.29 with interest of $42.97. Plaintiff paid the deficiency but refused to pay the interest. The case is now before us on plaintiff's motion for summary judgment and on defendant's cross motion and counterclaim for the $42.97 interest. Plaintiff does not dispute the amount of the interest and offers no reason why, if he owes the tax deficiency, the interest was not lawfully assessed.

The basis for plaintiff's claim is § 911(a) (2), Internal Revenue Code of 1954, which reads as follows:

(a) General rule.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

\* \* \* \* \* \*

(2) Presence in foreign country for 17 months. In the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (*except amounts paid by the United States or any agency thereof*) which constitute earned income attributable to services performed dur-

ing such 18-month period. \* \* \* (Emphasis supplied).

We think there is no triable issue of fact. The sole question for determination is whether Mr. Morse's employer, the United States Employees Association of Tehran, Iran, is an "agency" of the United States Government within the meaning of § 911, *supra*. We hold on reason and authority that the Association is an agency of the Government and that plaintiff is not entitled to exclude any salary payments from his gross income.

Plaintiff was hired to serve as assistant general manager of the Association, which the American Embassy employees organized "to provide for its members and their dependents recreational activities and a source of food and other items at minimum prices that are consistent with good service and efficient management." Article I, Constitution of the Association. The terms of his employment were specified in a contract which he entered with the Board of Directors of the Association. The contract provided for a fixed term of employment of 24 months, renewable, and with the proviso that either party could terminate upon sixty days written notice. The Association defrayed the cost of transporting plaintiff and his family from their Florida home to Tehran. He did not enjoy the benefits afforded by law to civil service employees, although the Association did agree to contribute up to $150 per year towards a private health plan. The right was reserved to cancel the contract should plaintiff be unable to perform his work due to physical disability lasting for 30 days. There were no appropriated funds available for his salary and it is to be assumed that he was to be paid from the available funds of the enterprise.

It is clear that plaintiff was in no sense a Government employee. However, the exception in § 911(a) (2) does not require that there be any employment relationship with the Government, nor is there a requirement that amounts so paid must be out of Treasury funds. It may

be paid by an "agency." While this term, so familiar to Washingtonians, may have varied meanings according to context, Webster's Unabridged Dictionary (3d Ed. 1968), assigns as one meaning: "a person or thing through which power is exerted or an end is achieved: *Instrumentality*." We think that is the meaning Congress intended here. As the Tax Court said in Cecil A. Donaldson, 51 T.C. 830, 836 (1969):

> * * *. Although the legislative history of the exception refers specifically only to salaries of military personnel, ambassadors, and consular officials paid directly by the United States, the scope of the exception is broader; otherwise, the phrase "or any agency thereof" is surplusage. See Kirchbaum [Krichbaum] v. United States, 138 F.Supp. 515, 519–523 (E.D.Tenn. 1956), for an extensive review of the pertinent legislative history.

The court had in mind, we are sure, that employees of "agencies" in the narrow sense are paid by the Government, and if they are the only ones covered, the addition of the phrase "or any agency thereof" serves no purpose. In *Donaldson,* the plaintiff was employed as assistant manager of the American Embassy Cooperative Commissary in Karachi, Pakistan, and his pay was held derived from such an "agency." The Commissary there, and the Association in the instant case, were both established under authority of State Department Regulations published in section 500, Volume 6, Foreign Affairs Manual, and issued pursuant to section 921(b) of the Foreign Service Act of 1946, as amended, 22 U.S.C. § 1139(b) (1964). Section 921 (b) authorizes the Secretary of State to prescribe regulations for the "establishment, maintenance, and operation by officers and employees of the Service, of non-Government operated commissary and mess services and recreation facilities at posts abroad." The Tax Court found that the congressional purpose in providing this authority was "to assist in alleviating adverse conditions abroad which might detract from the efficiency

of the foreign service." 51 T.C. at 837. From this purpose and the controls exercised over the Commissary by the Ambassador, the court concluded at 840–841:

> * * * the commissary was an agency of the United States. It was engaged in governmental rather than commercial functions, since its sole purpose was to contribute to the efficiency and convenience of the personnel of Government organizations with missions in Pakistan. It had no commercial objective, in that profits derived from its operations were used to reduce the sales price of items handled by the commissary. The Ambassador could order its dissolution at any time and, upon dissolution, its assets could be distributed only with the approval of the Ambassador. Policy, as well as management direction, was vested in the Ambassador, his staff, and the staffs of the various missions in Pakistan. * * *

Plaintiff attempts to distinguish this persuasive decision by what he terms "the voice of the membership of the Association in the instant case vis-a-vis the absence of such control over the management by the membership in the Donaldson case." He contends that this case is more like Brummitt v. United States, 329 F.2d 966, 165 Ct.Cl. 78 (1964), where this court held that an officers' mess in Taipei was not a nonappropriated fund activity as defined in Army Regulations and therefore not an agency of the Government under § 911. It was a private club formed by its members for their own purposes, on their own initiative. During the taxable year neither the Army nor the members considered the club to be governed by Army Regulations, there was no official review or audit of either policy or operations, and membership was unrestricted. There are other characteristics which distinguish *Brummitt* from *Donaldson,* but we think those mentioned are the most significant. We find the facts of the instant case like *Donaldson* rather than *Brummitt,* and since we think the

former case was soundly reasoned and correctly decided, we think it should be followed here rather than *Brummitt*.

The Internal Revenue Service reached a similar conclusion in a ruling which antedated plaintiff's employment. Rev. Rul. 64–255, 1964–2, C.B. 189 provides:

The activities of commissaries established and operated abroad by employees of the Department of State under the provisions of the Foreign Service Act of 1946, section 921(b), and regulated by the Foreign Service Manual promulgated thereunder, are activities performed on United States Government property in accordance with official regulations or instructions for the promotion of the government's interest. These commissaries are considered an arm of a department of the United States Government, and agencies or instrumentalities of the United States. See Rev. Rul. 54–612, C.B. 1954–2, 169. Therefore, the compensation of employees of the commissaries does not qualify for the exemption from Federal income tax afforded by section 911(a) of the Internal Revenue Code of 1954.

Plaintiff refers to other Revenue Rulings he says are inconsistent. We think it unnecessary to go into this because we would arrive at the same conclusion had no Revenue Ruling been issued on the State Department organizations here involved.

The court in *Donaldson* relied in part on the Supreme Court's opinion in Standard Oil Co. of Cal. v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942), where it was held that military post exchanges were "arms of the Government" and therefore sales to them were not subject to a state sales tax which on its face did not apply to sales to "the Government of the United States or any department thereof." Post exchanges are non-appropriated fund activities, the Government assuming none of the financial obligations thereof; nevertheless, the Court stated at 484–485, 62 S.Ct. at 1170, that:

The commanding officer of an Army Post, subject to the regulations and the commands of his own superior officers, has complete authority to establish and maintain an exchange. * *. The object of the exchanges is to provide convenient and reliable sources where soldiers can obtain their ordinary needs at the lowest possible prices. * * * government officers, under government regulations, handle and are responsible for all funds * * *. Profits, if any, do not go to individuals. They are used to improve the soldiers' mess, to provide various types of recreation and in general to add to the pleasure and comfort of the troops.

■ The elements of control, with power to initiate and terminate, with effectuation of Government purposes paramount over those of organizers and members, the exclusion of private profit, and the limitation of membership to Government-connected persons, serve to identify an "agency." This excludes such institutions as national banks having overseas branches, which, although chartered by the Government and regulated thereby, exist to earn a profit by serving the needs of the public generally. Plaintiff would have to show that the Association was "not established to provide essential morale and recreational facilities and services for personnel of an installation." *See*, Frank E. Raffensperger, 33 T.C. 1097, 1106 (1960).

The plaintiff alleges that his employer was "an association of cooperative consumer-patrons" who have "voluntarily joined together" to conduct a "strictly commercial business enterprise." He says that the "control and supervision exercised by the United States, through the Ambassador and his designee, is nominal and largely that exercised over any privately-owned business, operated by Americans, in a foreign land." In short, he tries to show that the Association is not governed by the State Department Regulations, *supra*. He does not deny the authenticity of the Regulations, and if they contemplate more control than plaintiff's affidavits show was exerted in

fact, we think it would be the Regulations that would govern in deciding whether the Association was, for the United States Government, a means by which an end was achieved. Thus the plaintiff does not tender a triable fact issue.

These Regulations provide extensive general standards for the operation of "non-Government operated commissary mess services and recreational facilities abroad." They provide initially that "all" such facilities "shall" be operated under these general standards and criteria. The principal officer at each post, here the Ambassador, is given the responsibility for making the initial determination of the need for and feasibility of establishing a facility. The Regulations specifically prohibit the establishment of any in localities where another United States agency operates similar facilities. Whenever feasible, they must be located on United States Government-held property; if that is not possible "an inconspicuous place should be selected." The principal officer is given authority to provide "necessary supplies, equipment, utilities and space in properties owned or leased by the United States Government." The Association here occupied rent-free quarters on the embassy compound. Appropriated funds "will" be made available "when required" to help establish new facilities. In the instant case, membership subscription fees furnished the initial working capital. The principal officer has the responsibility for "monitoring the activities of commissary and recreation associations to assure that the operations of such activities are conducted in a prudent manner in accordance with the policies of the Department and regulations prescribed herein."

It is clearly pointed out that the Government will not be responsible for any obligations of employee associations, but at the same time, certain minimum fiscal control measures are set forth. These are requirements for employee bonding, adequate insurance, independent audit and inventory, and the requirement that the principal officer be furnished a monthly statement of operations and balance sheet.

All profits "will be used for welfare and recreational activities." The constitution of the Tehran Association provides that profits will be "kept at a minimum consistent with efficient operation and sound financial management." Upon liquidation, any surplus "should be regarded as available for redistribution to facilities at other posts requiring financial assistance."

These Regulations make it plain that the Ambassador's control of the Association was more than "nominal." Indeed, we think the Ambassador's right to control these activities of his employees exists independent of the Regulations and is a function inherent in his office. See, Artwohl v. United States, 193 Ct.Cl. 382, 434 F.2d 1319 (1970). The Ambassador there was held within his rights to condition the sale by American diplomatic personnel in Brazil of privately-owned automobiles imported duty-free, on their agreement to surrender the "excess profits" derived from the sale to a charity of their own choosing. The Ambassador here perhaps could have prohibited the establishment of the Association altogether, had there been no Regulation on the subject.

A perusal of the Association's constitution and by-laws reveals nothing inconsistent with the Regulations and makes it apparent that the members themselves considered it bound thereby. The members adopted a constitution which restricted membership to:

* * * United States citizens who are not permanent residents of Iran and who by the nature of their duty assignments in Iran are permitted under agreement with the Government of Iran to import goods duty-free for themselves and their dependents, * * *.

The Board of Directors is given some discretion to act upon applications for membership not covered by the above, but all Board actions are subject to review by the Ambassador. The mem-

bership qualifications in *Donaldson* were also defined by the duty-free privilege. This indeed, seems basic, since one of the most significant functions of both facilities was to furnish American-made convenience and comfort items which Americans take so much for granted at home, and which apparently would have been quite costly were they subject to Iranian import duties. Among other uses, the Association affords a means to simplify exercise of the duty-free privilege in making minor purchases and gives the Ambassador a handle to control abuses of the kind dealt with in *Artwohl*. The Regulations reflect that the Association also is used to conserve United States foreign exchange by channeling members' personal purchases, so far as possible, to products of United States origin.

Plaintiff's reliance on the constitution and by-laws as evidence of the "voice of the membership" is simply not supported by the documents themselves. In fact, it appears that this "voice" is more like an *echo*. The members have the right to vote at annual and special meetings where they can amend the constitution. However, no amendment can be effective without the approval of the Ambassador. The business of the Association is carried on by the Board of Directors and the members have no vote on the selection of Board members. The Ambassador appoints the Chairman and the other Board members are appointed by the heads of the various Government agencies with missions in Iran. As if that were not enough, all Board actions are subject to review by the Ambassador.

The Board is empowered to write the by-laws, wherein their own duties and responsibilities are specified. The by-laws also specify the rights and responsibilities of the Association's members. There seem to be as many responsibilities as rights. A member may "enjoy the facilities" where he may purchase "reasonable" quantities which "shall be only for the needs of the member and his family." He will be given a copy of the constitution and by-laws, and he may inspect the books and minutes of Board meetings, although other than registering a complaint, there doesn't seem to be much he can do about anything he disagrees with.

The constitution also provides that the Association may be dissolved upon the order of the Ambassador and that he will make the decision, upon recommendation of the Board, as to distribution of surplus funds.

We are sure that such is not the usual supervision exercised by Ambassadors "over any privately-owned business, operated by Americans, in a foreign land." We do not see how the Ambassador's power of control could have been any tighter, even if, as a matter of his own discretion, he allowed the members to decide many questions by themselves. These are similar to the circumstances in *Donaldson* which prompted that court to comment, at 839:

> * * *. Thus, not only the policies and management of the commissary, but its very existence, were subject to Government control and direction. * *

■ In summary, we think that the United States Employees Association of Tehran is an "agency" of the Government within the meaning of § 911. Plaintiff's position as an employee of the Association is no different than if he were an employee of one of the activities his counsel concedes are "recognized Government agencies"; *e. g.*, "United States Armed Forces exchanges, commissioned and non-commissioned officers' messes, Armed Forces motion picture services and other organizations similarly organized and operated under Government regulations." *See*, Rev.Rul. 54–612, 1954–2, C.B. 169.

It is, therefore, unnecessary to consider the effect upon the controversy, if any, of the recital in plaintiff's contract, reading:

> It is understood by the Assistant General Manager that the entire amount [apparently, of a guaranteed severance fund to be paid over in case of his death or severance from employ-

ment] will be subject to the applicable United States taxes for income and F.I.C.A.

Plaintiff is not entitled to exclude his salary as assistant manager of the Association from his gross income. His motion for summary judgment is denied and his petition is dismissed. Defendant's cross motion is granted and it may recover on the counterclaim the undisputed amount of $42.97 from the plaintiff. Judgment is entered for defendant accordingly.