JOHN D. MCCOMISH AND GENEVIEVE A. MCCOMISH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4751-71.    Filed August 19, 1975.

John D. McComish, pro se.
*Alan R. Herson,* for the respondent.

### OPINION

RAUM, *Judge:* The Commissioner determined a deficiency of $2,810.45 in petitioners' Federal income tax for the calendar year 1968. The single issue to be resolved is whether amounts received by petitioner[1] from the government of the Trust Territory of the Pacific Islands for services rendered there by petitioner are exempt from Federal income taxation by reason of section 911(a)(2), I.R.C. 1954. The facts have been stipulated by the parties.

At the time of filing their petition herein, petitioners John D. McComish and Genevieve A. McComish, husband and wife, were legal residents of Honolulu, Hawaii.

Throughout the 2-year period commencing April 14, 1967, petitioner was employed as district attorney by the government of the Trust Territory of the Pacific Islands (Trust Territory). During that time he lived on Saipan, an island of the government of the Trust Territory. In 1968 he received paychecks drawn by the government of the Trust Territory amounting to $15,144.

---

[1] On account of the Commissioner's concession in respect of Genevieve McComish's income, the singular use of "petitioner" will refer to John McComish, whose income alone is now in controversy.

Genevieve McComish also lived on Saipan and in 1968 received payment of $282 from a Hawaii corporation for services rendered in the Trust Territory. Both petitioners were present in the Trust Territory at least 510 full days in the space of 18 consecutive months during 1967 and 1968.

The Trust Territory of the Pacific Islands is a group of more than 2,000 islands and islets situated in the Western Pacific Ocean, scattered over an oceanic area of about 3 million square miles. Their total land area is only 687 square miles, and only 64 of them are regularly inhabited. Popularly referred to as Micronesia, these islands include the Northern Mariana Islands, the Eastern and Western Caroline Islands, and the Marshall Islands. The history of these islands for the last 400 years has been marked by the presence of a succession of foreign interests. Late in the 19th century, after several centuries of Spanish rule, the islands fell under German control which, with the advent of World War I, was followed by Japanese occupation. In the aftermath of that war, the continued Japanese presence was formally recognized by the League of Nations which mandated the islands to Japan in 1920. The United States later endorsed this arrangement by virtue of a treaty with Japan signed at the Washington Conference in 1922. Convention with Japan regarding rights in former German islands, Feb. 11, 1922, 42 Stat. 2149, T.S. No. 664.

World War II brought an end to Japanese dominion in the area. During the latter part of the hostilities, the United States and allied forces captured several of the islands, the remainder of which were occupied after the formal surrender of Japan on September 2, 1945. As a result, all of the islands became subject to United States authority in accordance with the international law of belligerent occupation, and the United States thereupon established military government.

Following the creation of the United Nations, its Trusteeship Council assumed jurisdiction of the Trust Territories. The United Nations Security Council thereupon entered into a trusteeship agreement with the United States by which the United States, as "administering authority," accepted administrative authority for the people of the Trust Territory. On July 18, 1947, the United States Congress, by joint resolution, authorized the President to approve the agreement, which he did on the same day. Joint Resolution of July 18, 1947, ch. 271, 61

Stat. 397; Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665. By reason of the trusteeship agreement, the United States was vested with broad administrative authority. In particular, article 3 provided that:

> The administering authority shall have full powers of administration, legislation, and jurisdiction over the territory subject to the provisions of this agreement, and may apply to the trust territory, subject to any modifications which the administering authority may consider desirable, such of the laws of the United States as it may deem appropriate to local conditions and requirements.

It was further agreed that the United States' authority was to be exercised in the furtherance of certain enumerated political, economic, social, and educational objectives, among which was the following:

### ARTICLE 6

In discharging its obligations under Article 76(b) of the Charter, the administering authority shall:

1. foster the development of such political institutions as are suited to the trust territory and shall promote the development of the inhabitants of the trust territory toward self-government or independence, as may be appropriate to the particular circumstances of the trust territory and its peoples and the freely expressed wishes of the peoples concerned; and to this end shall give to the inhabitants of the trust territory a progressively increasing share in the administrative services in the territory; shall develop their participation in government; shall give due recognition to the customs of the inhabitants in providing a system of law for the territory; and shall take other appropriate measures toward these ends * * *

Although authorized by article 12 of the trusteeship agreement to enact such legislation as might be necessary to implement its terms, the United States Congress did not act in this respect until 1954, when it merely stated that all governmental authority in the Trust Territory rested with the President. Act of June 30, 1954, ch. 423, sec. 1, 68 Stat. 330, as amended, 48 U.S.C.A. sec. 1681(a). Prior to that time administrative responsibility for the islands had, by Executive order, been given first to the Department of the Navy, then to the Department of the Interior, with responsibility for parts of the Trust Territory redelegated to the Navy. Responsibility for the administration of the islands remained divided in this fashion until 1962, when the President redelegated the exclusive responsibility for the administration of civil government in all of the Trust Territory, "and all executive,

legislative, and judicial authority necessary for that administration," to the Secretary of the Interior. Exec. Order No. 11021, 27 Fed. Reg. 4409 (1962), 48 U.S.C.A. sec. 1681 note. The Secretary of the Interior was thereby authorized to:

take such actions as may be necessary and appropriate to carry out the obligations assumed by the United States as the administering authority of the trust territory under the terms of the trusteeship agreement and under the Charter of the United Nations.

And it was expressly stated in that Executive order that:

The executive, legislative, and judicial authority provided for in section 1 of this order may be exercised through such officers or employees of the Department of the Interior, *or through such other persons under the jurisdiction of the Secretary of the Interior, as the Secretary may designate, and shall be exercised in such manner as the Secretary, or any person or persons acting under the authority of the Secretary, may direct or authorize.* [Emphasis supplied.]

Under the authority thus delegated to him by this order, the Secretary of the Interior established a Trust Territory government, comprised of an executive, a legislative, and a judicial branch, similar in form to that of our Federal Government. Department of the Interior, Order No. 2876, 29 Fed. Reg. 1855 (1964); Department of the Interior, Order No. 2882, 29 Fed. Reg. 13613 (1964); Department of the Interior, Order No. 2918, 34 Fed. Reg. 157 (1968). Executive authority in the government is vested in the High Commissioner who is appointed by the President[2] and who has "the responsibility for carrying out the international obligations undertaken by the United States with respect to the Trust Territory." The authority of the Congress of Micronesia, the legislative organ of the government extends only so far as permitted by the Secretary and may be exercised only in accordance with the detailed procedures prescribed by the Secretary. Among the matters so regulated by the Secretary are membership of the Congress, qualifications of legislators, compensation of legislators, the franchise, legislative sessions, adjournment of the Congress, and the form in which legislation is to be enacted. All legislation is subject to veto first by the High Commissioner, and in the event his veto is overridden, then by the Secretary. Furthermore, the High Commissioner may, with the Secretary's approval, promulgate "urgent" legislation in the

[2] Sec. 2, Act of May 10, 1967, Pub. L. 90-16, 81 Stat. 15, 48 U.S.C.A. sec. 1681a. Prior to May 10, 1967, the Secretary of the Interior appointed the High Commissioner.

event the Congress fails to act. The High Commissioner must submit the annual budget of the Trust Territory to the Secretary for approval, and any subsequent deviations therefrom require the Secretary's prior approval. Communications of the government with foreign governments and international bodies are cleared through the Department of the Interior for transmittal by the Department of State. Judicial authority in the Trust Territory is vested in a chief justice and an associate justice,[3] both of whom are appointed by the Secretary. Thus, although this arrangement affords the citizens of the Trust Territory a limited degree of self-rule, it occurs only by reason of the Secretary of the Interior's order and is fully subject to his continuing supervision and direction. The Secretary could disband the government at any time, choosing to fulfill the United States' obligations under the trusteeship agreement through a different form of control.

Petitioner, a United States citizen, was employed as district attorney by the Trust Territory government. He was paid by check drawn upon funds in the Trust Territory government's payroll account in which were commingled funds granted by the United States and revenues generated locally. Petitioner never reported to nor was responsible to any United States official in the conduct of his employment. In their joint Federal income tax returns for 1968, petitioners excluded their combined salaries of $15,426 from their gross income, claiming that it was exempt as income earned abroad. In his notice of deficiency the Commissioner determined that $15,426 "was paid by the United States or an agency thereof," on account of which it was not exempt from United States income taxation. The Commissioner has since conceded that $282 earned by Genevieve McComish was properly treated as exempt income.

By reason of section 911(a)(2) of the Internal Revenue Code,[4]

---

[3] More recently, provision has been made for two associate justices. See *Groves v. United States* (N.D. Fla., Nov. 21, 1974), not officially reported, but may be found in 35 AFTR 2d 817, 818, 75-1 USTC par. 9212.

[4] SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

* * *

(2) PRESENCE IN FOREIGN COUNTRY FOR 17 MONTHS.—In the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United

a limited amount of foreign source income earned by a United States citizen while in a foreign country for a prescribed period of time is exempt from Federal income taxation. There is, however, a parenthetical exception to this exclusion in the case of "amounts paid by the United States or any agency thereof." It is the applicability of this exception to the amounts paid to petitioner which we must determine, there being agreement between the parties that petitioner has otherwise fulfilled the conditions of section 911(a)(2). It is our conclusion that the government of the Trust Territory is an "agency" of the United States within the meaning of section 911(a)(2), and that accordingly the amounts which it paid to petitioner are not exempt from Federal income taxation.

The issue here is narrowly drawn. The Commissioner admits that the Trust Territory is a foreign country as intended by section 911(a)(2), and he makes no suggestion that petitioner was an employee of the United States. The Commissioner's single contention is that *the government* of the Trust Territory, petitioner's employer, was an "agency" of the United States. Rev. Rul. 68-608, 1968-2 C.B. 309.

It is well settled that the term "agency," as it appears in the parenthetical exception contained in section 911(a)(2), refers to a broader character of entities than merely the various formal departments and so-called "independent agencies" of the United States Government. *Morse v. United States*, 443 F. 2d 1185, 1187 (Ct. Cl.), certiorari denied 405 U.S. 989; *Boleslaw D. Kalinski*, 64 T.C. 119, 126; *Cecil A. Donaldson*, 51 T.C. 830, 836. This understanding of the meaning of the word "agency" is reflected in the regulations where the statutory use of that word is taken to mean an "instrumentality" of the United States. Sec. 1.911-1(b)(1), Income Tax Regs. As the word "instrumentality" suggests, the distinctive feature by which such an agency (other than one through which the United States directly engages in ordinary governmental activities) may be identified is that the elements of its control reside within the United States Government enabling the Federal Government thereby to implement

States or any agency thereof) which constitute earned income attributable to services performed during such 18-month period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

governmental purposes and policies through the agency. Cf. *Morse v. United States*, 443 F. 2d 1185 (Ct. Cl.); *Cecil A. Donaldson*, 51 T.C. 830; *Frank E. Raffensperger*, 33 T.C. 1097; see also *Standard Oil Co. v. Johnson*, 316 U.S. 481, 485.

It has thus been held that the American Embassy Cooperative Commissary in Pakistan is an agency for purposes of section 911. Organized and operated in compliance with State Department regulations, it served a governmental objective in respect of the Government's employees' morale and was therefore an agency, despite the fact that it received no operating funds from the United States and that the Government assumed no responsibility for its obligations to third parties. *Cecil A. Donaldson*, 51 T. C. 830; See also *Morse v. United States*, 443 F. 2d 1185 (United States Employees Association of Tehran, Iran); *Erlandson v. Commissioner*, 277 F. 2d 70 (9th Cir.) (private shipping firm operating U.S.-owned ship in the Far East pursuant to contractual arrangement); *Robert W. Teskey*, 30 T.C. 456 (same); *Boleslaw D. Kalinski*, 64 T.C. 119 (United States Air Force Europe Child Guidance Center in Wiesbaden, Germany); *Laurence P. Dowd*, 37 T.C. 399 (United States Educational Commission in Japan); *Frank E. Raffensperger*, 33 T.C. 1097 (Union Club of Tokyo); *Chester D. Taylor, Jr.*, 30 T.C.M. 233 (Kindergarten School Fund at Clark Air Base, Philippine Islands). Likewise, the government of American Samoa, a United States possession, has been deemed to be an agency for purposes of the analogous provision of section 251(j), I.R.C. 1939, the predecessor of the present Code section 931(i). In *Bell v. Commissioner*, 278 F. 2d 100 (4th Cir.), affirming 32 T.C. 839 and 30 T.C. 559, the Court of Appeals concluded that (p. 103):

the term "agency" is used in its ordinary and customary meaning and since the Government of American Samoa is under the Department of the Interior, a department of the Federal Government, it is an agency of the United States.

The fact that American Samoa enjoyed a degree of self-government did not preclude it from being an agency of the United States since it did so by order of the United States in accordance with the United States policy of encouraging self-rule. And most recently, the District Court of the Northern District of Florida has decided, in an opinion with which we agree, that the government of the Trust Territory also is an agency of the United States within the meaning of section 911(a)(2). *Groves v.*

*United States, supra,* not officially reported but may be found in 35 AFTR 2d 817, 75-1 USTC par. 9212.

The government of the Trust Territory is the means by which the United States has chosen to fulfill its treaty obligations arising under the trusteeship agreement, specifically to "foster the development of such political institutions as are suited to the trust territory." It is the creation of the United States, subject to the Secretary's control and designed to enable him to exercise the authority delegated by the President. That it also serves the purposes of the people of the Trust Territory by affording them a degree of self-government as well as educational, social, and economic advancement does not render it any less an instrumentality or arm of the Federal Government. Indeed, the Trust Territory government's relationship with the Secretary of the Interior allows no other conclusion. The Secretary established it by his order; he may at any time disband it. And while it exists, the executive, legislative, and judicial authority of that government may be exercised only "in such manner as the Secretary, or any person or persons acting under the authority of the Secretary, may direct or authorize." Exec. Order No. 11021, *supra,* p. 912. Further elaboration is hardly necessary to conclude that the government of the Trust Territory is the means by which the United States exercises its jurisdiction over the Trust Territory arising under the trusteeship agreement. And the critical feature of that government, for purposes of section 911(a)(2), is that the ultimate authority over it rests with the United States Government. Even its limited powers of self-government are a reflection of United States control inasmuch as such powers are subject to revocation at any time. The government of the Trust Territory is plainly an instrumentality of United States policy, wholly subject to the control and direction of the United States and is therefore an "agency" of the United States within the meaning of section 911(a)(2).

Our conclusion is not altered by the fact that the Trust Territory government commingled locally generated revenues with United States appropriated funds,[5] out of which combined fund petitioner's salary was paid. However, even if *all* of the government's funds were derived from local revenues, it would

---

[5] The materials before us indicate that the greater portion of the fund had its source in amounts contributed by the United States; only a comparatively small amount represented locally generated revenues.

have no conclusive bearing on the government's character as an instrumentality of the United States, the basis upon which we regard it as an agency of the United States. See *Cecil A. Donaldson,* 51 T.C. 830, 839-840. And having determined that it is an agency, we are satisfied that the statute, by its explicit terms, is applicable to any "amounts paid" by that agency without further inquiry into the origin of those funds. Cf. *Commissioner v. Mooneyhan,* 404 F. 2d 522, 526 (6th Cir.), reversing 47 T.C. 693; *Johnson v. United States,* 390 F. 2d 715, 717 (Ct. Cl.); *Commissioner v. Wolfe,* 361 F. 2d 62, 66 (D.C. Cir.), reversing 43 T.C. 572, certiorari denied 385 U.S. 838. There is no dispute that petitioner's salary was the obligation solely of the Trust Territory government which must be regarded as having paid the amounts here in issue.

Nor do we consider it anomalous that although the Trust Territory is a foreign country, its government is an agency of the United States. There is nothing in the concept of a United States agency requiring that it be situated in the United States. See *Boleslaw D. Kalinski,* 64 T.C. 119; *Groves v. United States, supra,* not officially reported but may be found in 35 AFTR 2d 817, 75-1 USTC par. 9212.

Petitioner makes the argument that the Commissioner's application of section 911(a)(2) is in conflict with the statute's purpose. Without setting forth the entire legislative history of section 911(a)(2), suffice it to say that we find nothing therein which compels a different result. The exception for amounts paid by the United States or any agency thereof was first enacted in 1932.[6] Revenue Act of 1932, ch. 209, sec. 116(a), 47 Stat. 204. At that time it was thought that the earlier enacted exemption for income earned while residing abroad, which had been intended to remove the competitive disadvantage of double taxation on American businessmen abroad, had no proper role in respect of those who were in any event exempt from foreign taxation, as was

---

[6] The exemption as enacted in 1926, to which the 1932 amendment applied, was available to a United States citizen who had been a "bona fide nonresident of the United States for more than six months during the taxable year." Revenue Act of 1926, ch. 27, sec. 213(b)(14), 44 Stat. 26. This was the predecessor of current Code sec. 911(a)(1). The statutory forerunner of sec. 911(a)(2), with which we are here concerned, was added to the 1939 Code by the Revenue Act of 1951, ch. 521, sec. 321(a), 65 Stat. 498. By reason of that amendment, the exemption was generally made available to United States citizens present in a foreign country for 17 months in an 18-consecutive-month period. However, an exception for amounts paid by the United States or any agency thereof, identical to that of the earlier law, was included in the new provision and reenacted in sec. 911(a)(2).

usually true of United States Government employees stationed overseas. S. Rept. No. 665, 72d Cong., 1st Sess. p. 31 (1932); H. Rept. No. 1492, 72d Cong., 1st Sess. 15 (1932); 75 Cong. Rec. 10410-10411. However, instead of making the exception applicable only to those American citizens who were exempt from foreign taxation or only to employees of the United States Government, Congress settled on the broader language encompassing "amounts paid by the United States or any agency thereof." The language of this exception has remained unchanged through successive reenactments. And while it does not reflect the more refined exception seemingly contemplated by its attendant history, the language is of such obvious breadth that we must assume that its broader application was intended by Congress. See *Frank E. Raffensperger,* 33 T.C. 1097, 1109.

Petitioner here is not engaged in foreign trade of any sort nor is he in competition with businessmen of another country. In this context, and especially in view of expansive language employed by Congress, we do not think it contrary to the legislative purpose to reject petitioner's narrow reading of "agency" in favor of one which comprehends the Trust Territory government. We note further that, although the government of the Trust Territory might have taxed petitioner in respect of his income, it in fact did not do so and there is therefore no question of double taxation present here.[7]

Petitioner has drawn our attention to several cases in which other courts have decided that, *for purposes other than the Internal Revenue Code,* the government of the Trust Territory is not to be regarded as an agency of the United States. *People of Saipan v. United States Dept. of Interior,* 502 F. 2d 90, 94-95 (9th Cir.) (Administrative Procedure Act and National Environmental Protection Act); *Porter v. United States,* 496 F. 2d 583, 588-589 (Ct. Cl.) (contract law). We can understand petitioner's distress in learning, much to his disadvantage, that the dimensions of the term "agency" may expand or contract according to the context in which the word appears. But it is simply too much for petitioner to assume, and for us to hold, that the word "agency" must be afforded a single, inflexible definition

---

[7] Even though the Trust Territory in later years appears to have imposed such taxes, that fact was not regarded as decisive in *Groves v. United States, supra,* involving such a later year, where it was stated that "while they [the taxpayers] are taxed by the territorial government, Congress apparently recognized such would occur in some instances." 35 AFTR 2d 817, 820, 75-1 USTC par. 9212.

throughout the body of Federal law without regard for the variety of purposes which it may be called on to serve. Indeed, the Ninth Circuit in the *Saipan* case, relied upon by petitioner, noted that the meaning of the word "agency" may be different "for such purposes as income taxation." 502 F. 2d at 95. Thus, each statute must be examined independently in light of the situation to which it is addressed.[8] It is on this basis that we have concluded that the government of the Trust Territory is an agency of the United States as intended by section 911(a)(2). Petitioner is therefore not entitled to exclude from gross income the amounts paid to him by it.

*Decision will be entered under Rule 155.*

---

[8] Moreover, it is a recognized rule of statutory construction that the same word or phrase appearing in different places in the internal revenue laws themselves may have different meanings depending upon the context and legislative purpose involved. See *Helvering v. Stockholms &c. Bank,* 293 U.S. 84, 86-88; *Helvering v. Morgan's, Inc.,* 293 U.S. 121, 128; cf. *Rohmer v. Commissioner,* 153 F. 2d 61, 65 (2d Cir.).