Boleslaw D. KALINSKI and Dorothy M. Kalinski, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Carol Marie SCHMIDT, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Nos. 75–1340 and 75–1341.

United States Court of Appeals, First Circuit.

Argued Dec. 1, 1975.

Decided Jan. 22, 1976.

---

* The Honorable William J. Jameson, United States District Judge for the District of Montana, sitting by designation.

Alexander J. Kalinski, Manchester, N. H., for petitioners-appellants.

Jeffrey S. Blum, Asst. Atty. Gen., Tax Div., Dept. of Justice, with whom Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, and Jonathan S. Cohen, Attys., Tax Div., Dept. of Justice, Washington, D. C., were on brief, for respondent-appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

In their federal income tax returns for the year 1969 appellants excluded from gross income amounts earned as employees of the United States Air Force Europe (USAFE) Child Guidance Center in Wiesbaden, Germany.[1] The Commissioner determined that these amounts were not excludable under Int.Rev.Code § 911(a)(2)[2] and asserted deficiencies for

---

1. Appellants Boleslaw D. Kalinski and Dorothy M. Kalinski filed a joint federal income tax return for 1969; appellant Carol Marie Schmidt filed a return as a single individual. The returns were submitted to the Office of International Operations, Washington, D. C. Although only Dorothy M. Kalinski and Carol Marie Schmidt actually were employed at the Child Guidance Center, for convenience we refer generally to these two former employees, as well as to all three taxpayers as appellants.

2. Section 911 provides, in pertinent part:

" . . . *Earned income from sources without the United States*

(a) *General Rule.*—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

.    .    .    .    .

(2) *Presence in foreign country for 17 months.*—In the case of an individual citizen

each of the appellants.[3] The Tax Court found for the Commissioner and the taxpayers appeal. The resolution of this case depends on whether the center at which taxpayers worked is covered by the language of § 911(a)(2) which excepts from the income exclusion "amounts paid by the United States or any agency thereof."

In 1969 Dorothy M. Kalinski earned $5,890.59 as a secretary-stenographer, and Carol Marie Schmidt earned $8,892.98 as a speech pathologist at the USAFE Child Guidance Center (Center).[4] The Center was set up in 1964 on the recommendation of the chief surgeon to General G. P. Disosway, USAF commander-in-chief who authorized the Center's establishment.[5] It was located in the hospital of the USAF base at Wiesbaden. However, it was not a service

for the Wiesbaden base alone, and by 1969 it served the entire USAFE command. The director was an Air Force child psychiatrist although the work of the Center was performed by nonmilitary, civilian personnel.[6] These personnel were attached to the Wiesbaden base hospital for all administrative purposes. The Directorate of Personal Services, Personnel Affairs Division, USAF, designed the salaries and benefits of the Center's civilian employees to correspond with those provided for nonappropriated-fund employees.[7] Appellants' contracts for employment at the Center were executed with "The USAFE Child Guidance Clinic, represented by the Custodian, Central Base Fund" as the employer, and were signed by an Air Force sergeant who had custody of the Central Base Fund.[8]

of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States *(except amounts paid by the United States or any agency thereof)* which constitute earned income attributable to services performed during such 18-month period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c)." (Emphasis supplied).

3. The Commissioner determined deficiencies in appellants' 1969 federal income taxes as follows:

Boleslaw D. and

Dorothy M. Kalinski     $1,893.31

Carole Marie Schmidt     1,629.01.

4. Both taxpayers were physically present in the Federal Republic of Germany for at least 510 full days in 18 consecutive months (including the year 1969) as required by § 911(a)(2).

The question was raised at oral argument as to whether the taxpayers were within the coverage of the Status of Forces Agreements. Although supplemental briefing has been provided on this question, the parties remain divided. We do not resolve this issue as we find it unnecessary to a determination here.

5. The prime reason cited by Gen. Disosway for establishing the Center was a lack of adequate medical facilities for treatment of handicapped children of USAFE personnel which frequently caused affected Air Force families in his command to seek reassignment to areas where

treatment was more readily accessible. *See Boleslaw D. Kalinski*, 64 T.C. No. 10 (May 3, 1975), ¶ 64.10 P–H TC at 66.

6. The Center's staff consisted of a clinical psychologist, an assistant psychologist, a speech pathologist, a social worker, a secretary, and a clerk-stenographer.

7. Nonappropriated funds, in the context of this case, are moneys not appropriated by Congress but generated by participation of Air Force personnel and others in Air Force religious, morale, welfare, and recreation programs such as base exchanges, theaters, book departments, and restaurants. Nonappropriated funds are considered United States assets controlled by the Air Force. Nonappropriated-fund instrumentalities, in the present context, are entities established by the Secretary of the Air Force to administer nonappropriated funds for the benefit of Air Force personnel and their dependents, as well as civilian employees of the Air Force.

The employees of the Center received benefits similar to those received by nonappropriated-fund activity employees, including insurance in the USAF Nonappropriated Fund Group Insurance Plan. The Tax Court, since it found the Child Guidance Center to be "an agency of the United States" did not decide whether the Center was a nonappropriated-fund activity. Likewise we do not reach this question. *See* discussion *infra*.

8. The contracts were headed "Air Force Aid Society Employment Contract USAFE Child Guidance Clinic." *See Boleslaw D. Kalinski*, *supra*, ¶ 64.10 P–H TC at 67.

The Center was operated under an official Air Force program called "Children Have A Potential" (CHAP).[9] CHAP sponsorship and monitoring of the Center included review of the Center's budget, documentation, and professional ethics. CHAP had power to disapprove Center budget requests, and the decision to begin charging fees from users of the Center was approved by CHAP in consultation with the Air Force Aid Society (AFAS).[10]

The Center's operating funds came from several sources. Appropriated funds paid for the salary of the Air Force child psychiatrist who directed the Center, and for office space, supplies, utilities, and equipment. Grants from the AFAS [11] initially paid for the salaries and other benefits of the civilian employees.[12] However, after March 1968, when the Center began charging fees for its services most of the funds to pay the Center's civilian employees' salaries and benefits came from parents of children

served by the Center and the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). See 10 U.S.C. § 1071 et seq. (1970).

The Custodian of the Central Base Fund administered the funds of the Center and served as its contracting and disbursing officer. Funds from AFAS and from parental fees were received by the custodian and placed in a designated fund for the benefit of the Center. The Center's expenses were paid by checks drawn on this fund, including salaries of the Center's employees.

Center requests for AFAS funds were forwarded and approved through military channels. The hospital commander in Wiesbaden would approve a request and send it on to the surgeon at Air Force headquarters; it would then go to CHAP for approval, then to the AFAS section at the Military Personnel Center at Randolph Air Force Base, Texas, and thereafter to AFAS national headquarters. AFAS disbursements to the Center

---

**9.** Air Force manuals indicate that the CHAP program was "designed to provide assistance to eligible military personnel and their spouses who have unmarried children who are emotionally disturbed or physically or mentally handicapped and are incapable of self-support." *Boleslaw D. Kalinski, supra,* ¶ 64.10 P–H TC at 68–69.

**10.** The Tax Court found that fees were charged, in part, so that AFAS grants to the Center could be reduced. AFAS grants were never in excess of the Center's actual budget requirements: surplus funds at the end of a grant period were deducted from the next AFAS payment. When the Center began receiving appropriated funds for its operations in January 1972 AFAS payments were discontinued, and the Center refunded to AFAS unspent funds previously received.

**11.** The AFAS is a corporation formed under the laws of the District of Columbia. It is governed by a board of trustees, six of whose 15 members are ex officio, as follows: the Secretary of the Air Force, the Air Force Chief of Staff and his wife, the Air Force Deputy Chief of Staff for Personnel, the Comptroller of the Air Force and the Director of the Air Force Aid Society. The remaining trustees are elected, although the record does not reflect by whom. In 1969 the AFAS director was a retired Air Force general. Since March 1, 1946, AFAS has been the official emergency

relief organization of the Air Force. AFAS income is derived from annual campaign contributions, memorial contributions, profits from Air Force installation fund-raising activities, contributions from civilian firms and individuals, interest and dividends from investments, and royalties from books, songs, etc. The annual campaign is conducted by the Air Force itself to publicize AFAS benefits and to elicit contributions from Air Force personnel. Administration of AFAS programs and the annual campaign at Air Force installations is carried out by Air Force officers and enlisted men assigned the duty by the installation commanders.

**12.** In a letter to the Air Force Deputy Chief of Staff, Personnel, concerning authorization to establish the Center, Gen. Disosway stated:

". . . I request that you pass my request on to the Aid Society for a commitment for $160,800 to pay the salaries of the six persons we believe we need for the next three years to do this job. I am inclosing a more detailed plan and explanation of our proposal.

"During the last three years the personnel of the USAFE have contributed over $200,-000 to the Air Force Aid Society. I am convinced they will give substantially more during the next three years if I can tell them of Aid Society support of our Center. . . ."

travelled the same path in reverse. The Center's operations were subject to audit by the Air Force Comptroller General; they were not audited by AFAS. In 1969 the Center's operating expenses were approximately $100,000. AFAS paid $16,414.54 of that amount. The difference came from fees the Center charged parents. Parents paid the first $50 and 20 percent of all additional charges. CHAMPUS paid the remaining 80 percent of the additional charges.

█ Appellants claim they are entitled to the § 911(a)(2) income exclusion because the salaries they earned from employment at the Center were not paid directly by the United States or any agency thereof. However, this claim cannot avail. It restricts too narrowly the definition of "agency" by making it depend on who fills the role of payor. A United States "agency" for purposes of § 911(a)(2) is more appropriately identified by essential characteristics of its structure. As the Court of Claims has stated: "The elements of control, with power to initiate and terminate, with effectuation of Government purposes paramount over those of organizers and members, the exclusion of private profit, and the limitation of membership to Government-connected persons, serve to identify an 'agency'." *Morse v. United States*, 443 F.2d 1185, 1188, 195 Ct.Cl. 1 (1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). *See Bell v. C.I.R.*, 278 F.2d 100, 103 (4th Cir. 1960).

As the Tax Court correctly held, these elements of agency status are present in this case. The United States Air Force had pervasive control over the Center and its personnel. The Center was initiated by the USAF commander-in-chief to satisfy command needs for a facility to provide care to dependent handi-capped children of Air Force personnel in Europe. The Center was operated under the official Air Force CHAP program which monitored important elements of the Center's functioning. CHAP had the power to disapprove Center budget requests for other than financial reasons; and CHAP in consultation with the AFAS determined (over the opposition of certain Center personnel) that the Center would begin charging fees. It was under the immediate direction of an Air Force psychiatrist, and under the overall supervision of the commander of the Air Force hospital at the Wiesbaden base.

The Center was not operated for profit[13] and its major funding sources were subject to military control or influence. Although the AFAS in 1969 contributed a portion of the Center's funds, request for AFAS grants required clearance through military channels, including approval by CHAP and the surgeon at the United States headquarters of the Air Force. The Air Force paid the salary of the military psychiatrist in charge of the Center and for its office space, supplies, utilities, and equipment. After March 1968 most of the Center's funds derived from fees charged parents of children treated there. The Center's services were available only to Air Force personnel.

The Center's employment contracts made appellants and other civilian employees "subject to military law, including but not limited to applicable rules, regulations, and directives issued by competent US military authorities, to the same extent . . . as . . . any US citizen employees paid from appropriated funds by the Air Force." Center employees also contracted to conform to "the same standards of conduct

---

13. The exclusion of private profit was one of the central reasons for creating the "agency" exception to the § 911(a)(2) income exclusion. *C.I.R. v. Wolfe*, 124 U.S.App.D.C. 45, 361 F.2d 62, 66, *cert. denied*, 385 U.S. 838, 87 S.Ct. 86, 17 L.Ed.2d 72 (1966); *see Fink v. United States*, 454 F.2d 1387, 1394 (Ct.Cl.), *cert. denied*, 409 U.S. 844, 93 S.Ct. 46, 34 L.Ed.2d 84 (1972); *C.I.R. v. Mooneyhan*, 404 F.2d 522, 525–26 (6th Cir. 1968), *cert. denied*, 394 U.S. 1001, 89 S.Ct. 1593, 22 L.Ed.2d 778 (1969); *Krichbaum v. United States*, 138 F.Supp. 515, 519 (E.D.Tenn.1956). It is undisputed that the Center was organized on a nonprofit basis; however this fact although relevant is not in itself determinative of the issue here.

and rules of discipline as are applicable to US citizen employees paid from appropriated funds." Center holidays were those "observed by the USAF and its US citizen [appropriated fund] employees." Further, the contracts specified that employee grievances not satisfactorily settled by the Center director who himself was an Air Force officer, could be appealed for a final decision to the Wiesbaden base commander. *Boleslaw D. Kalinski, supra,* ¶ 64.10 P–H TC at 71.

■ In summary, the Center was established and operated under pervasive Air Force financial and supervisory control, solely to accomplish Air Force purposes, on a nonprofit basis, limited to persons directly or indirectly affiliated with the Air Force. Accordingly, as the Tax Court correctly concluded, the Center was an "agency of the United States" for purposes of § 911(a)(2). *See Morse v. United States, supra; see also Cecil A. Donaldson,* 51 T.C. 830, 836 (1969); *cf. Frank E. Raffensperger,* 33 T.C. 1097 (1960).

■ Appellants contend that even if the Center was an agency their earnings are still excludable under § 911(a)(2) because the Center was merely a conduit for money actually paid to them by private sources. Appellants emphasize that although the Air Force Central Base Fund handled their salaries, these funds were not commingled with other monies but were treated as separate trust funds and came entirely from nongovernmental sources, in particular the AFAS. In pressing these claims appellants rely principally on *Krichbaum v. United States, supra.* In that case (involving a provision of the 1939 Code, as amended, essentially similar to § 911(a)(2)) the taxpayer worked as an administrative assistant to a road-builder engaged by the Bureau of Public Roads of the United

States Department of Commerce to work in Ethiopia. The district court found that the Ethiopian government paid the taxpayer's salary and thereafter received reimbursement for this outlay from the Bureau of Public Roads. The court held that although an agency of the United States was the ultimate source of funds, nevertheless a payment made "by another, but with the debtor's money, . . . is payment by the debtor," 138 F.Supp. at 518, and that consequently the taxpayer's income from Ethiopia was not subject to United States taxation. However, *Krichbaum,* apart from its questionable status as precedent, *see C.I.R. v. Wolfe, supra* at 64, does not aid appellants since the Center, not the AFAS, was in fact both obligor and payor of their salaries. The employment contracts ran directly from the Center, "represented by the Custodian of the [Wiesbaden] Central Base Fund" to appellants Kalinski and Schmidt. And the Tax Court properly found that "the AFAS did not contract individually with, or have any obligation to, Center employees . . . ," and that no "other source of the Center's funds had financial obligations directly to the Center's civilian employees." *Boleslaw D. Kalinski, supra,* ¶ 64.10 P–H TC at 71–72.

■ Appellants also contend that because the Center was neither an "appropriated fund activity" nor a "nonappropriated fund activity" it was not an agency of the United States. They claim support for this proposition in *Brummitt v. United States,* 329 F.2d 966, 165 Ct.Cl. 78 (1964), which held that income earned from a United States army officers' club on Taiwan was exempt from taxation because the club was not a "nonappropriated fund activity." However, we need not decide whether the Center was a nonappropriated fund activity [14] since even if it were not, the

---

14. The Tax Court indicated that, on the basis of the facts before it, "[i]f it were necessary to resolve this question, . . . we would find that the Center was a nonappropriated fund activity." Boleslaw D. Kalinski, *supra,* ¶ 64.10 P–H TC at 72. We express no opinion on this issue except to note that many of the factors relied on by the *Brummitt* court—in particular that the officers' club was not located on or in a military installation but was constructed on independently-owned land, and that club membership was not restricted, 329 F.2d at 969—

Center could be, as the Tax Court properly found it was, an agency of the United States for purposes of § 911(a)(2). *See Morse v. United States, supra* at 1188.

*Affirmed.*

are not applicable to the Center which was located on a military installation, in Air Force facilities, and whose services were restricted to Air Force-connected persons.